148 F.2d 529 (1945)
ARMOUR & CO.
v.
BOWLES, Price Administrator.
No. 101.
United States Emergency Court of Appeals.
Heard October 4, 1944.
Decided March 29, 1945.
Writ of Certiorari Denied June 4, 1945.
*530 Donald R. Richberg, of Chicago, Ill. (George E. Leonard, Jr., of Chicago, Ill., on the brief), for complainant.
Jacob D. Hyman, Chief Court Review Price Branch, of Washington, D. C. (Richard H. Field, Gen. Counsel, Nathaniel L. Nathanson, Associate Gen. Counsel, and Carl H. Fulda, all of Washington, D. C., and Charles Rotstein, Atty. of New York City, on the brief), for respondent.
Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.
Heard at Chicago October 4, 1944.
Writ of Certiorari Denied June 4, 1945. See 65 S.Ct. 1411.
MAGRUDER, Judge.
This case had its origin in a protest filed by Armour and Company on February 8, 1943, setting forth various objections to Revised Maximum Price Regulation No. 169  Beef and Veal Carcasses and Wholesale Cuts (7 F.R. 10381). It was alleged that the maximum prices established by the regulation did not provide a generally fair and equitable margin of profit and required protestant to sell such carcasses and cuts at a loss. In substantiation of this allegation, the protest was accompanied by numerous exhibits showing Armour's costs at Chicago of various grades of beef carcasses for the weeks ending May 9, 1942, December 12, 1942, and January 23, 1943, computed by the so-called cut-out test method, which will be described and discussed subsequently in this opinion.
On March 12, 1943, the Administrator issued an order providing protestant an opportunity to present further evidence relating to cattle slaughtered in recent years, volume in pounds and dollars of each class of dressed meat sold, realization from sales of carcass beef, and a current profit and loss statement. Additional evidence in response to this order was filed by Armour on May 10, 1943. Upon the representation that certain items requested would require an inordinate labor to compile, the Administrator on July 3, 1943, modified said order of March 12, 1943, by striking out certain items and substituting others on which information was requested. On August 19, 1943, Armour filed the additional evidence requested.
On August 24, 1943, the Administrator ordered Armour's protest to be consolidated with pending protests of a number of other meat packers, incorporated into the record certain exhibits of statistical data, and afforded protestants fifteen days within which to file rebuttal evidence.
All of the protests in the consolidated proceeding were denied by order issued October 27, 1943, except in so far as relief had been granted pursuant to the Directive of the Office of Economic Stabilization, issued October 26, 1943, relating to livestock slaughter subsidy payments. 8 F.R. 14641. Accompanying the order was an elaborate opinion by the Administrator, and an appendix relating to the profits of the industry. In view of the new facts introduced by the subsidy Directive of October 26, 1943, protestants were given thirty days within which to request a reconsideration of their protests, "upon a showing that the relief being granted pursuant to said Directive is insufficient to achieve the objectives indicated in the accompanying opinion."
Armour filed a complaint in this court on November 26, 1943. On January 10, 1944, we granted an application by complainant for leave to introduce additional evidence, and ordered the same to be presented to the Administrator, together with such other evidence as the Administrator might deem it proper to receive. Subsequently, the Administrator reopened the protest proceedings and received additional evidence. On June 21, 1944, the Administrator issued an order, with opinion, denying Armour's protest upon reconsideration. An amended complaint was filed by Armour. At the hearing before us, both complainant and respondent were permitted to introduce certain additional evidence directly to the court.
The meat industry ranks well up with the automobile and steel industries in annual value of its product. Over fifty per cent of the beef processed and sold annually in the United States is accounted for by four very large corporations, Swift, Wilson, Cudahy, and Armour, the present complainant. The "big four" have introduced to the fullest extent mass production methods in slaughtering and processing. The processing of numerous by-products has become an important part of their activities. By weight, the ordinary beef cattle is less than two thirds fresh meat carcass. The remainder is manufactured, often with the addition of parts of sheep and hogs, into many different products such as *531 sausages, pharmaceuticals, tallow, oils, etc. With the development of a mass distribution system for the efficient handling of their products, it has become the practice of the larger packers to distribute their overhead by handling also such items as eggs, poultry, cheese and butter. In addition to the "big four", the industry contains a larger number of medium size packers and processors who vary considerably in the degree to which they process the raw by-products of their beef slaughtering operations, but who nevertheless have this characteristic feature of the industry as a whole. In numbers, by far the largest group in the industry are small non-processing slaughterers, who account for about fifteen per cent of the beef processed and sold annually in the United States.
The meat packers and slaughterers obtain their cattle from the livestock markets and other sources all over the United States. Important livestock marketing areas include Chicago, Kansas City, Omaha, and St. Louis. Of these, the most important is the Chicago livestock market. While only fourteen per cent of the cattle marketed is sold in Chicago, this market tends to influence in some degree the prices for cattle throughout the country, and it seems that Chicago sells a higher proportion of the top grades of cattle than appears from the volume of sales.
In undertaking to regulate prices in the meat industry, the Administrator has come up against one of his thorniest administrative problems. The effect of the regulation can only be gauged in the light of an understanding of the economics of a vast and intricate industry. The record is laden with complicated statistical data from which the parties seek to draw conflicting inferences. Our task of judicial review is one of peculiar difficulty. Able briefs and oral arguments have been submitted by counsel for the complainant and for the Administrator  and this, in one sense, paradoxically enough, has made the case harder for us to decide.
The Administrator originally placed the meat packing industry under price control by means of the General Maximum Price Regulation, which fixed the maximum prices on the basis of the prices prevailing in March, 1942. For various reasons this general freeze method was found by the Administrator to be unsatisfactory as applied to the particular industry. Therefore, on June 19, 1942, he issued a regulation especially applicable to the meat industry, Maximum Price Regulation No. 169, which, while making provisions for the special characteristics of the industry, continued to use the March, 1942, prices as a base (7 F.R 4653). Finally, on December 10, 1942, the Administrator issued Revised Maximum Price Regulation No. 169, the regulation whose validity is now at issue in the present case. Its major feature was the establishment of dollars-and-cents ceiling prices on the wholesale level for all fresh beef and veal commodities. It treated all packers on a uniform basis, and it also aimed at simplifying the administration of price control in this field. The Kansas City market was used as a price base, and differentials were allowed, based on the cost of transportation to various other zones to which cattle and beef moved. For more effective administration of price control, wholesale cuts of beef and veal were standardized and dollars-and-cents prices were established on each.
Because of the enormously increased demands of the war agencies, Lend-Lease, and the civilian public, the demand for cattle was much greater than the supply. Notwithstanding this, the Administrator did not at this time attempt to establish ceiling prices on live cattle. As subsequently explained by the Economic Stabilization Director: "A primary objection to a live cattle ceiling has been the difficulty of grading live cattle `on the hoof' and, in particular, of determining the grade of carcass beef which any individual steer will produce. The industry has customarily bought cattle at varying prices depending on expert estimation of the quantity and quality of meat which will be obtained. The appraisal which cannot be made with certainty on an individual base can be and normally has been made on the basis of aggregate purchases over an extended period."
It was the Administrator's theory that, even without ceiling prices on live cattle, the influence of wholesale beef ceiling prices would result in maintaining the historical relationships between wholesale beef and livestock prices. In his Statement of Considerations accompanying Revised Maximum Price Regulation No. 169, the Administrator said:
"It is estimated, on the basis of historical relationships over many years, that the wholesale beef prices established under the Revised Regulation should reflect approximately *532 the following average live cattle prices at Chicago:
"AA, $15.80; A, $14.50; B, $12.70; C, $10.80.
"The September [1942] average prices per 100 pounds at Chicago for the various grades of slaughter steers were:
"AA, $15.69; A, $14.63; B, $12.87; C, $10.79."
In the Administrator's opinion filed with the order of August 24, 1943, consolidating the various pending protests, the following statement is made:
"In view of the controlling influence which the price at any stage of production exerts upon the price at an earlier stage, the Administrator could reasonably anticipate that the imposition of ceiling prices on meats at retail and wholesale would effectively limit also the prices paid for livestock, and that the imposition of such ceilings would be sufficient to maintain the historical stability in the relationship among the prices at the various stages of production and in particular between the wholesale and livestock prices."
Unfortunately, this theory did not seem to work out under the abnormal conditions of a wartime economy. Soon after RMPR 169 was issued, cattle prices began to rise; the cattle prices on which the regulation appears to have been predicated were soon left behind in the rising market. The situation became particularly acute in the first half of 1943 and was of great concern to the Administrator. At the hearings before the House Committee on Agriculture on October 26, 1943 (78th Cong., 1st Sess.), Mr. Gilbert, Economic Adviser to the Administrator, testified as follows:
"We assumed that when we fixed the price of carcass and wholesale cuts that that would hold the price of livestock below that level at a point sufficient to permit the industry to make its normal margin on slaughter. The whole experience of generations goes to support the view which we took at that time.
"Now, as a matter of fact, that didn't happen, and the price of livestock rose, and it rose for several reasons. A very basic reason is the fact that we cannot, through price control, effectively plug the prices that are charged for processed items. In a tight market it was possible for the packers to diminish their meat content and make enough profit on their processed items to bid up the prices of livestock. Another fact, of course, was that some of these people that were put into the red went into the `black market,' and then were able to pay anything they pleased for livestock because they could recoup their costs at `black market' prices.
"There we are, in the course of a year, whereas we had expected for a period of months that the price of livestock would fall back into a proper relationship with the price of carcass and wholesale cuts, it failed to do so, and when it failed to do so, it was pretty clear to us that we could not provide a reasonable margin for the slaughterer unless, some way or other, we could bring live prices under some kind of control." (Hearings 7-8.)
At a later point in his testimony (p. 13) Mr. Gilbert said: "We have consulted the industry and the War Food Administration continuously for a matter of 9 months, and this is the first time we have seen the light of day on this program [indirect control of cattle prices by subsidy payments], and this program gives us a means of doing right by the processor who, in my judgment, has got a miserable shellacking for 9 months, an inexcusable shellacking."
Mr. Gilbert pointed out that the small non-processing slaughterers were being squeezed the most since they were unable to make up their fresh beef losses by profits on the processing of by-products.
We shall now try to describe briefly the subsidy program referred to by Mr. Gilbert. As part of the President's hold-the-line policy (Exec. Order 9328, 8 F.R. 4681), the maximum prices of carcass beef and wholesale cuts were reduced approximately ten per cent by order of the Economic Stabilization Director (Amendment No. 15 to RMPR 169, 8 F.R. 7675). This reduction was compensated for by the payment of corresponding subsidies to slaughterers so that they, in turn, could continue to pay the same prices as before for live cattle. There was, however, at this time no attempt to impose controls on the movement of live cattle prices. But subsequently, the growing acuteness of the situation with reference to live cattle prices led the Administrator, together with the Economic Stabilization Director, to work out a method of indirectly controlling cattle prices which it was hoped would give the needed relief to the industry. A subsidy program, involving a modification of the subsidy established in June, 1943, was put into effect by a Directive of the Economic Stabilization *533 Director to the Defense Supplies Corporation issued October 26, 1943 (8 F.R. 14641).
As a foundation for this subsidy, the following price ranges were set for the various grades of live cattle, allowing a one-dollar spread for each grade:

 Price per cwt.,
 Grade: at Chicago
 AA Choice .......... $15.00 to $16.00
 A Good ............ 14.25 to 15.25
 B Medium .......... 12.00 to 13.00
 C Common .......... 10.00 to 11.00
 Cutter and Canner 7.45 to 8.45
 Bologna Bills ...

The amount of the subsidy per hundredweight varies with the grade. Pursuant to the Directive, cattle are graded after being dressed, and the live weight for the carcasses is calculated by means of standard carcass yields for each grade. That is, the slaughterer finds the total weight of carcasses of each grade produced in a month. That weight, divided by the prescribed standard percentage yield factor for the grade, gives the approximate live weight of the cattle from which these carcasses were derived. The number of hundredweight is multiplied by the specified upper price limit for cattle of the grade. The total of these figures for the various grades is the slaughterer's maximum permissible payment in order to qualify for the subsidy in full. If the total of the prices he actually paid for cattle of all grades during the month exceeds that amount, the slaughterer's subsidy is reduced by the amount of the excess. Likewise, the number of hundredweight is multiplied by the specified lower price limit for cattle of the grade. The total of these figures for the various grades is the slaughterer's minimum permissible payment in order to qualify for the subsidy in full. If the total of the prices he actually paid for cattle during the month is less than that amount, his subsidy is correspondingly reduced. In effect, then, the subsidy plan tended to provide both a floor and a ceiling for live cattle prices. The difficulties of grading "on the hoof" are avoided. There is no penalty for paying above, or below, the range for any given grade of cattle so long as the total monthly payments for all grades do not exceed, or fall below, the permissible maximum and minimum.
It was recognized that the non-processing slaughterers, who produce about 15 per cent of the national yield of carcass beef, were in a less favorable position than the integrated packers who derive considerable profits from the further processing of raw by-products. Therefore, in addition to the above subsidy, a further allowance of 80 cents per cwt. was provided for non-processing slaughterers, defined as those slaughterers who, during 1942, or a representative portion thereof, sold and who currently sell 98 per cent or more of the total dressed carcass weight of cattle slaughtered by them in the form of carcasses, wholesale cuts, frozen boneless beef or ground beef. It was thought that this allowance was sufficient to enable the non-processing slaughterers to stay in business, at the same time allowing the Administrator to retain his dollars-and-cents price ceilings at the wholesale and retail levels for all slaughterers, large and small.
At this point we shall dispose of one objection by Armour which we deem to be wholly lacking in merit. It is urged that the regulation is unlawfully discriminatory against the processing slaughterers, in that they are permitted to realize only the ceiling prices plus the general subsidy paid to all slaughterers under the cattle stabilization plan, whereas the non-processing slaughterers receive in addition the special 80-cent subsidy. But the differential was based upon a proper recognition of the very different economic positions of these two segments of the industry. The processing slaughterers have had the advantage of an integrated business in that their cattle operations yield important profits through the utilization of by-products of cattle slaughter in further processing operations. According to the statement of the Director of Economic Stabilization in explanation of the need for the special 80-cent subsidy: "Non-processing slaughterers have operated profitably in the past by various means, notably skill in buying and selling and ability to command premium prices in particular markets. Increased wartime demand for beef, pressing hard against the supply, and the establishment of uniform ceiling prices for all sellers, have tended to eliminate the conditions under which these slaughterers could operate profitably. Returns from processing operations, which have increased the earnings of the great bulk of the industry, have not been open to them." The Administrator would therefore have been fully warranted in establishing higher ceiling *534 prices for the non-processing slaughterers, under his authority in § 2(c) of the Act, 50 U.S.C.A.Appendix § 902(c), to establish in price regulations such classifications, differentiations, and reasonable exceptions, as in the judgment of the Administrator are necessary or proper in order to effectuate the purposes of the Act. He did not do this, because higher ceiling wholesale prices for non-processing slaughterers alone would have destroyed the foundation upon which were based the uniform dollars-and-cents retail prices regarded by the Administrator as essential to effective control of meat prices. Instead, he recommended the alternative program put into effect by the Directive of October 26, 1943, namely, the payment to non-processors of a special additional subsidy affording them a benefit equivalent to what they would have obtained by higher ceiling price differentials in their favor.
The Administrator relies heavily upon the operation of the subsidy program as sustaining the present validity of RMPR No. 169. While the subsidy is not a part of the regulation issued by the Price Administrator, its existence is an economic factor which cannot be disregarded in estimating whether the regulation is generally fair and equitable. There is much dispute between the parties as to how far the operation of the subsidy plan has alleviated the situation.
The average cost of all grades of cattle slaughtered in the United States has receded and has been running in 1944 substantially lower than in the corresponding months of the preceding year. However, there has been some rise in the prices of the better grades of cattle; the average cost for the four top grades at Chicago in June, July and August of 1944 exceeded the maximum price established under the subsidy directive for the highest grade of steer.[1] From this it would be rational to infer that those packers who buy all grades and types of cattle receive substantial benefit from the lower average costs, but those packers, particularly non-processors, who concentrate largely on fresh beef and confine their purchases to the top grades of steer, receive little or no benefit.
The Administrator has presented directly to the court additional evidence showing the subsidy plan in operation. This evidence consists of a compilation of subsidy claims presented to the Defense Supplies Corporation, showing the relationship of the amounts actually spent by slaughterers for cattle in the first six months of 1944 to the maximum and minimum prices permissible under the subsidy ranges above set forth. The indication is that, on the whole, the 21 firms whose operations are considered in the table were able to purchase cattle during the first six months of 1944 at prices averaging below the top of the range, except for the month of June, although the monthly averages of some of the companies fell outside the range, either above or below. This evidence is consistent with the downward trend of average total cattle costs mentioned above, indicating that, broadly speaking, the subsidy plan has stabilized the movement of cattle prices within a relatively narrow range considerably below the highs of the first half of 1943.
Armour has introduced additional evidence giving figures through July, 1944, showing that, while the average cost of cattle has declined by $1.18 per cwt., this has been accompanied by a decline of 1.9% in the average dressing yields (the percentage of fresh beef per cwt. of live weight). From this Armour infers that the reductions in live costs of cattle do not compensate for the greater proportion of low grade cattle slaughtered during the same period. The Administrator explains the problem as follows:
"A decline in yield has a far less serious effect on returns to the packer than a drop in grade. A simplified example will illustrate the point. Assume ceiling prices of *535 $20 for Grade A carcasses and $18 for Grade B carcasses. A live steer weighing 1,000 lbs. and yielding 58%, will produce a carcass of Grade A worth $116 (580 lbs. or 5.8 cwt. × $20.). If the yield drops to 56%, the value of the carcass will be $112. (560 lbs. or 5.6 cwt. × $20.). If, however, the 2% drop in yield also means a drop in grade, the value of the carcass will be only $101 (560 lbs. or 5.6 cwt. × $18.)."
It is asserted by the Administrator that there has not been a significant decline in the grades of beef being marketed; and that the decline in average dressing yields may be accounted for by lower yields within the same grade of cattle. If this is true, the realization would not be lowered as much as if there had been a drop in grade. We find the evidence on this point somewhat inconclusive. In his brief, however, the Administrator concedes: "The lower percentage yields in 1944 reflect the greater proportion of lower-grade cattle, which will produce carcasses of lower grade and hence reflect lower sales value. For this reason, the full amount of the difference between this year's [cattle] prices and last year's cannot be assumed to represent a net increase in return."
Complainant's basic contention is that the "cut-out test" method of accounting, as used by complainant and by the industry generally, is the proper method of determining whether the regulation grants a price for beef carcasses and wholesale cuts that is generally fair and equitable. Armour's own figures of cut-out results show the following (italicized figures denoting losses):

 Per cwt.
 1936 $1,757,000 $ .146
 1937 717,000 .065
 1938 2,403,000 .220
 1939 393,000 .035
 1940 868,000 .073
 1941 1,089,000 .077
 1942 3,244,000 .212
 1943 9,811,000 .782
 1944 7,482,000
 (Nov. 1943-
 Aug. 1944)

The Administrator insists that the losses on fresh beef as shown by the cut-out method are more in the nature of bookkeeping losses which fail to take fully into account the integrated nature of the industry; that a showing of a cut-out loss on carcass beef, or of an increase in cut-out loss, does not result in the conclusion that excessive prices are being paid for cattle so long as those making the decision know that the processing of the by-products of cattle slaughter is producing profits in excess of the cut-out losses. Further, he insists that accounting practices in the industry do not provide a means whereby the Administrator can compare the cost of buying, processing and handling cattle in all its parts with the results obtained, and thus to determine whether there has been an actual loss in the over-all cattle operations, except in the case of non-processing slaughterers who are provided for by a special subsidy. Consequently, the Administrator argues that the only reliable yardstick for determining whether the prices fixed in RMPR 169 are generally fair and equitable is to compare the over-all profit position of the industry under price control with a representative peacetime period. He stresses the evidence in the record that the over-all earnings of the meat industry under the regulation are substantially in excess of its earnings during the years 1936 through 1939. The industry's return on invested capital in 1942 was 14.1%, compared with an average of 4.1% in the four years 1936-1939. The return on sales rose from 1% in the prewar base period to 2.6% in the first quarter of 1943 and 5.3% in the first quarter of 1944. Profits, before taxes, of 22 representative companies, of varying sizes, rose about 20% in 1943 as compared with 1942. Another exhibit embracing 28 companies for the first quarter of 1944 shows a further increase of profits before taxes as compared with the first quarter of 1943. Armour's own profits before taxes, in round figures, are shown as follows:

 1936-1939 $ 9,500,000
 1939 10,000,000
 1940 12,000,000
 1941 20,000,000
 1942 25,000,000
 1943 36,000,000

The cut-out test method is described in an affidavit by the General Auditor of complainant as follows:
"The test method of determining dressed carcass beef or boneless beef costs is long and well established in the industry and is a proper method for determining such *536 costs. The slaughter of cattle produces a major product of beef and by-products of hides, edible offal and inedible offal. The primary objective of the operation is to obtain fresh beef, a perishable product which must be marketed promptly. It is, therefore, necessary that the cost of this major product of the cattle slaughtering operation be determined at the time of slaughter. As to the by-products of the cattle slaughtering operation, the hide requires a protracted period for curing, and some of the edible and, in general, all of the inedible offal require varying periods of time for processing. Due to the need for determining the cost of the fresh beef at the time of slaughter, it is necessary that a determination be made at that time of the value of the by-products. This is the test method of determining the cost of the fresh beef. The procedure is to deduct from the cost of the live animal plus slaughtering expenses a credit for by-products based on the current market value of such by-products.
"The application of this test method establishes the raw material cost to the by-product departments on the basis of the current market value of the by-products at time of slaughter. Competitively, this is the only practical method of accounting inasmuch as some slaughterers process by-products extensively while others sell their by-products to non-slaughtering processors."[2]
Under price control, the credit for the raw by-products is based upon the OPA ceiling prices rather than the current market value.
The following discussion of the accounting problem is taken from Greer, Packinghouse Accounting (1929) pp. 30, 31:
"The packer is engaged in the production of commodities which are subject to striking conditions of joint and major and by-product cost. The production of beef, for instance, means that other things, such as hides, fats, fertilizer, etc., are produced in the same operation  they are all joint products; and it is a commonplace in economics that while the cost of all joint products taken together may be computed, the costs of the individual products cannot be ascertained.
"The problem of joint cost is one which arises in the operations of only a few industries. The only known method of figuring costs in these industries is to compute the cost of the major or primary product by deducting from the total cost the net market value of the by-products. This method was recognized and used by the United States Tariff Commission in ascertaining the cost of producing wool, where the by-product was mutton, and it is approved by public service commissions in their standarized accounting classifications for calculating the cost of producing artificial gas, where the by-product is coke.
"To explain the packer's cost-finding methods more fully, take the problem of the butcher who buys a steer weighing 1,000 pounds alive, for which he pays $100.00. When he has slaughtered and dressed it, he will have a dressed carcass of beef weighing about 500 pounds, a hide, some fats, a tongue, a heart, a liver, and many other by-products. How will he figure costs?
"He knows that he can sell the hide for, say, $20.00; the fats for $3.00; and the other by-products for $2.00  a total of $25.00 worth of by-products. He knows also that the slaughtering and dressing has cost him, say, $5.00. Naturally he will *537 figure the dressed cost of the carcass of beef in this manner:

 Paid for live steer weighing 1,000
 lb. ..................................... $100.00
 Expense of slaughter and dressing 5.00
 _______
 Total cost of dressed beef and by-products $105.00
 Can sell by-products to net............... 25.00
 _______
 Balance, cost of 500 lb. of dressed
 beef .................................... $ 80.00

or an average of 16 cents per pound.
"This is the accepted method of computing the cost of a dressed carcass; and it is the method that the packer must follow if he is to conduct his business intelligently."
In his opinion of June 21, 1944, the Administrator makes the following criticism of the cut-out test method:
"The Administrator concluded in the opinion of October 27, 1943, that a loss so calculated was merely a bookkeeping loss. The reasons for this conclusion are evident. In actual operations, a packer buys a lot of steers, breaks them up, processes the parts in a variety of ways, and finally sells them. His `costs' are the sum of the price paid for the steers and the money expended for labor, materials, and overhead in processing and selling the products. Comparing that sum with the total proceeds derived from the sale of all the products obtained from the steers shows whether the packer made a profit or suffered a loss. The cut-out test does not give a comparable result. In the first place, the entire cost of the live animal is thrown onto the dressed carcass. No part of that cost is allocated to the material which represents the remaining third of the animal. While a so-called `credit' is given for byproducts, that does not even purport to represent the cost of those byproducts. Under these circumstances, the results cannot be said to represent the actual cost of the carcasses. Moreover, the amount of the credit is determined by reference to the market value or ceiling price of the unprocessed byproducts, whereas it is the most important characteristic of the packing industry that it does not in general sell those byproducts, but processes them extensively before sale. Hence neither the market prices for byproducts in unprocessed form, nor ceiling prices based on those market values, can be said to reflect either the cost of the unprocessed byproducts or their value to packers. Moreover, since packers generally further process the byproducts, any value assigned to them for purposes of transfer to the processing departments is essentially a matter of internal bookkeeping and nothing more."
The Administrator finds support for his criticism of the cut-out test in Part V of the Federal Trade Commission Report on the Meat-Packing Industry (1920). The Commission made an exhaustive examination of the accounting methods of the large meat packers, and reached conclusions which in general coincide with the position taken by the Administrator. We quote from this report as follows (pp. 55-56):
"Transfers of raw material from department to department within the plant constitute a large factor in packing plant accounting. From the slaughtering department all products, except carcass meat, are transferred to certain primary by-products or to `specialty' by-product departments. The former includes such departments as hide, offal, lard, and oleo, while the latter includes such departments as soap, fertilizer, glue, and butterine. The primary by-product departments in turn may transfer a great deal of animal raw material to `specialty' departments. Transfers in and out of storage and freezer also constitute a part of this procedure.
"Almost without exception these transfers are based on `market' valuation, not on the actual cost of the items transferred. The effect of such transfer valuation on the departmental accounts is two-fold: First, the compilation of accurate costs is rendered impossible, and second, the final results of any given department are thus based in part on prices that have not been actually realized  prices representing anticipated profits or losses. The departmental account accordingly shows a bookkeeping rather than an actual final result.
"Furthermore, on much of the material transferred, such as blood, bones, tankage, glue stock, etc., there is no ascertainable outside market, and the packers must perforce place quite arbitrary valuations on this material having no probable relation to either cost or market. Again certain products are in the green stage when transferred, and an outside market only obtains for the finished stage, with the result that arbitrary deductions must be made from the finished market, estimated to establish *538 a non-existent `green' market. The certification of internal transfer prices presents, accordingly, an almost interminable problem to any outside reviewing body.
"Thus transfer prices not being based on cost, provide a technique whereby profits may be arbitrarily thrown from one department into another in much the same fashion as arbitrary billing prices (based on `market' quotations) for products shipped from plants to branch houses throw the profit from the former to the latter, or vice versa. It is a notable fact, that according to the present method of departmental accounting, the packers are in the habit of showing low profits or even positive losses in the carcass-meat departments, while at the same time exhibiting large profits in the by-products or `specialty' departments, the chief reason for this somewhat extraordinary state of affairs being found in the valuations placed upon transfers."[3]
In addition to his theoretical criticisms of the cut-out test for price control purposes, the Administrator asserts that, for the industry as a whole, the average value of beef carcasses and unprocessed by-products has historically been less than the cost of purchasing and slaughtering cattle. From this he concludes that the historical losses shown by the cut-out test must be more apparent than real and that the test is, therefore, inherently unreliable, for it could scarcely be assumed that the industry would have continued indefinitely to lose money on fresh beef operations. In support of his assertion of such historical loss, the Administrator has included in the record evidence in the form of a graph with supporting data showing the relationship between the market price of good and choice steers and their reflected cut-out value since 1937 at the Chicago market. For most of that period, with the exception of short intervals, the market price of steers did in fact exceed the reflected cut-out value. The largest loss prior to price control for choice steers was in the latter half of 1937. In its amended complaint, Armour apparently concedes the fact of such historical loss, and indeed Armour's own figures, arrived at by the cut-out test method, seem to bear out the Administrator's statistics for the industry generally. But Armour insists that the existence of this historical loss is irrelevant to the present issues. Also, Armour points out, what is undoubtedly the fact, that the cut-out losses have increased to an unprecedented degree since the imposition of price control, and insists that this in itself would warrant the conclusion that the maximum prices established by the regulation are not generally fair and equitable.
The Administrator, while conceding this adverse trend in cut-out losses, undertakes to show that they have been more than compensated by a large increase in sausage manufacturing and other by-product manufacturing. For example, complainant's figures show that the number of pounds of sausage, including hamburger, produced by Armour in the quarterly period ending January 30, 1943, was 72.5% greater than in the corresponding period for 1941, and that the amount of beef used in sausage manufacturing increased by 84%. However, the dressed weight of cattle slaughtered by Armour in the same periods increased by only 2.9%. From this, the Administrator infers that Armour has been employing an increasing percentage of its cattle, particularly the lower grades, in the manufacture of sausage and other by-products. He points to the fact that there has been an enormous increase in the profits of Armour's Miscellaneous Division (sausage, shortening, animal by-products, etc.) and Canned Meat Department. Summarizing the data contained in Armour's confidential exhibits, the Administrator stated in his opinion of June 21, 1944:
"Protestant's additional evidence strikingly demonstrates to what paradoxical results the application of Protestant's test would lead. Thus Protestant showed that from 1938 through 1941 it sustained a `loss' in its beef division in every year. As business conditions improved under the stimulus of war-inspired demand, these `losses' increased from about $400,000 in 1939 to $800,000 in 1940, to more than $1,000,000 in 1941. At the same time profits on over-all operations were soaring from $10,000,000 to $12,000,000 to almost $20,000,000 increases of 20% and 100% above 1939. After the imposition of price control, both losses and profits continued the same trend: 1942, beef loss, $3,000,000, total profit, $27,000,000; 1943, beef loss, almost $10,000,000, total profit, about $40,000,000. This apparent contradiction is resolved by the course of profits resulting *539 from the processing of materials derived from the slaughter of livestock, including cattle. These are stated as a percentage of the 1938-1939 average; Miscellaneous Division (sausage, shortening, animal by-products, etc.) 1940, 100%; 1941, 174%; 1942, 247%; 1943, 602%; canned meat department, 1940, 136%; 1941, 444%; 1942, 1008%; 1943, 1334% (Exhibits VII and VIII)."
On the whole, we cannot say that the Administrator was without rational support in his conclusion that the cut-out test method of cost accounting is not an acceptable yardstick for determining whether the Regulation establishes generally fair and equitable maximum prices.
On the other hand, we do not think that there is warrant in the Act for the alternative put forward by the Administrator, namely, that the over-all profit position of the industry is the only appropriate standard for determining whether the maximum prices prescribed in RMPR 169 are generally fair and equitable.
In Gillespie-Rogers-Pyatt Co., Inc., et al. v. Bowles, Em.App., 1944, 144 F.2d 361, 364, we considered and upheld the standards generally applied by the Administrator in cases of multiple-product industries for the purpose of determining whether maximum prices are generally fair and equitable within the meaning of the Act. Under the industry earnings standard adopted by the Administrator, as a general rule, price increases are allowed to compensate for those cost increases which the industry cannot absorb without impairment of its normal peacetime earnings. Even though a price increase is not required under the industry earnings standard, an increase may be required under the so-called product standard, which is used as a secondary pricing guide in the case of multiple-product industries. Under this standard, unless it has been the industry's practice to sell some of its products below cost, the Administrator considers himself required to increase the maximum price of any particular product sold by the industry, "if its current maximum price should fail to cover the out-of-pocket costs incurred by the highest-cost firms which are not included in the industry's high-cost marginal fringe." We pointed out in the Gillespie case that Congress fully understood and approved the use by the Administrator of the industry earnings and product pricing standards when it extended the Emergency Price Control Act, 50 U.S.C.A.Appendix § 901 et seq. by the enactment of the Stabilization Extension Act of 1944, 50 U.S.C.A.Appendix § 961 et seq.; and we concluded that the application of these standards by the Administrator in multiple-product industries "is a reasonable exercise of the discretion conferred upon him in the administration of the act and is in consonance with its mandate." In that case we said:
"The use in Section 2(a) of the statute [50 U.S.C.A.Appendix § 902(a)] of the phrases `price or prices of a commodity or commodities' and `maximum price or maximum prices' indicates that the statutory standard  `generally fair and equitable'  is not necessarily to be applied separately to the price of each individual commodity but may, in an appropriate situation, be applied to the aggregate of the prices of a group of commodities. An industry which customarily deals in a group of commodities presents such a situation. It is a phenomenon of our peacetime economy that a multiple-product industry which earns satisfactory profits on its over-all operations frequently finds it necessary or desirable to sell one or more items of its line of commodities at cost or even at a loss. The act does not compel changes in practices of this sort. Consequently the effect of the aggregate of the maximum prices of all the commodity items dealt in by a multiple-product industry upon its over-all operations and profits and the resulting increase or decrease in industry earnings is relevant in considering the question whether the maximum price of a particular item continues to be generally fair and equitable to the industry.
"The effect of the maximum price of the particular item is, of course, equally relevant. The Administrator's policy, as we have seen, is to protect the industry against an out-of-pocket loss on every item not customarily sold at a loss. But the raising of the maximum price of a particular commodity to a level which would assure a profit upon its sale without regard to the total profits of the industry from its overall operations might not effectuate the purposes of the act to stabilize prices and prevent abnormal and unwarranted price increases. The factors involved in this problem and the reasons which support the Administrator's pricing standards have been well stated by his counsel in a memorandum *540 submitted to the Committees on Banking and Currency of the Senate and House of Representatives, as follows:
"`The problem, like most problems of price control, is one of choice between alternatives. It should be emphasized, however, that the choice is not between a standard which relies exclusively upon the test of over-all earnings and one which measures the fairness of a price solely in terms of cost and profit data applicable to the particular product. As the very existence of the product standard makes clear, the Administrator has never taken the position that any price for a particular product is fair, no matter how low, so long as over-all peacetime earnings are equaled. Obviously the Administrator cannot maintain a ceiling price of 1 cent for a loaf of bread merely because bakers are doing well on pies, cakes, and cookies. The product standard recognized this. It was developed precisely for the purpose of giving firm assurance that no such extreme variations from normal or appropriate price relationships would occur, or, if they occurred, be maintained. The choice accordingly is between the existing dual standards, which take account of both over-all earnings and single-product costs, and a single standard which disregards over-all earnings and looks exclusively to costs and profits on the particular product.'" (Italics added.)
The Administrator now urges that he cannot apply the secondary product test to the multiple-product meat industry because there is no acceptable accounting method by which to ascertain what, if any, are the out-of-pocket costs sustained in the processing of beef, or, indeed, to ascertain the results of the integrated cattle operations considered as an entirety. He falls back, therefore, on the primary test of over-all profits, which indiscriminately includes not only the profits of the industry attributed to cattle operations but also an important part of the industry's profits not in any way attributable to the domestic slaughter of cattle. But if this over-all profits test were to be sustained, it would tend to produce the result mentioned in the italicized portion of the memorandum quoted in the Gillespie case and set forth above. It would be saying in substance that the Administrator has power to subsidize the consumer in his purchases of beef to the extent that the present over-all profits of the industry are above those of the base period. There would be no legal limitation to the extent to which the Administrator could depress prices of a given commodity so long as the industry as a whole maintained its base period earnings.
Armour has introduced in evidence its figures allocating and crediting to the Beef Division its equitable share of all profits made by any other department out of byproducts of beef, in order to show the total results of its entire cattle operations. Though consistently maintaining its position that the only relevant figures are its "losses" on carcass beef computed by the cut-out test method, as set forth above, Armour has undertaken to show the results of its cattle operations as an entirety, as called for by an order of the Administrator of February 21, 1944, reopening the protest proceedings and providing an opportunity to complainant to present additional evidence.[4]
*541 Briefly, the amount of the profits of the processing departments allocated back to the primary slaughtering divisions was arrived at on the basis of the ratio that the value of the raw materials received from the primary slaughtering divisions bore to the value of the total raw materials processed in each processing department. In addition to an allocation of profits, the record also contains an allocation of Armour's general expenses attributable to the beef department. In presenting this evidence, the affidavit of complainant's General Auditor stated:
"In an integrated packing plant doing extensive processing of by-products, the results obtained on the by-products from the slaughter of cattle are not inextricably mingled with the results obtained on the by-products from the slaughter of other animals. The very fact that by-products are charged to by-product processing departments on the basis of current market values makes it possible to make an equitable allocation of the results of a by-product department which does joint processing of materials from more than one class of animal and of non-animal materials."
The Administrator makes some criticisms in detail as to the method of allocation used in carrying back to the Beef Division a proportionate part of the profits of the various processing departments. He questions also the method of allocating expenses to the beef department, especially administrative and selling expenses. But for present purposes, we may accept the allocation results at their face value.
The disclosed results of Armour's overall cattle operations are much more favorable than the results quoted previously, computed on the cut-out test method, showing large losses on carcass beef. For the fiscal years 1941 and 1942, the allocation results show a profit of $870,000 and $2,363,000, respectively, on the entire cattle operations, as contrasted with cut-out losses on carcass beef of over one million dollars in 1941 and over three million dollars in 1942. In 1943, the allocation loss was only $269,000, as contrasted with a cut-out loss on carcass beef of nearly ten million dollars for that year. In the last ten months of the fiscal year 1944, the allocation results show a loss of over four million dollars, but this figure was computed on the basis of the processing results from sausage and canned meats only; and we infer that this loss would be reduced about a third if the allocable portion of the profits from the other processing departments were taken into account.
We think that it would be reasonable to apply the secondary product standard upheld by us in the Gillespie case to cattle operations as an entirety, treated either as a single product or as a closely related group of products. Such treatment would take into account the integrated nature of these operations as a general characteristic of the industry. Thus where, as in the present case, the industry earnings are above their normal peacetime level, no adjustment of maximum prices is required if, at present established ceilings, the cattle operations are producing enough to recover out-of-pocket costs in respect thereto.
Without undertaking to define precisely what is meant by "out-of-pocket costs", they do include direct labor and material costs, and undoubtedly exclude general overhead such as administrative and selling expenses. Even with an allocation for the fiscal year 1942 to the beef department of overhead expenses in the sum of $10,917,000, Armour's cattle operations for that year, according to the allocation results, still showed a profit. With an allocation to the beef department of overhead expenses in the fiscal year 1943 in the sum of $8,528,000, cattle operations in that year, according to the allocation results, showed a loss of only $269,000. So far as appears, therefore, cattle operations as a whole have not only returned the "out-of-pocket costs" but also made a substantial contribution to the general overhead expenses. The legal standard sustained in the Gillespie case requires no more.
*542 In this connection it may be pointed out that, even if we should apply this secondary product test to carcass beef as a single product, accepting Armour's "losses" on that product as indicated by the cut-out test method of accounting, and further assuming that such "losses" are representative of the industry, only a small upward adjustment of maximum prices would be called for. It would be entitled to none on the showing for its fiscal year 1942, when its cut-out loss was $3,244,000, even after allocating to the beef department selling and general administrative expenses in the sum of $10,917,000. In the fiscal year 1943, Armour's cut-out loss on carcass beef climbed to $9,811,000, after charging to the beef department selling and general administrative expenses in the sum of $8,528,000. Its out-of-pocket expenses, therefore, were not in excess of, and might well be less than, $1,283,000.
Complainant contends that the Administrator's pricing standards upheld by us in the Gillespie case, that is, the industry earnings standard, coupled with the product standard used as a secondary pricing guide in respect to multiple-product industries, are inapplicable in the present case, since we are dealing with products resulting from the processing of agricultural commodities. In the Gillespie case, we approved these pricing standards of the Administrator as being in conformity with the general standard prescribed in § 2(a) of the Act, 50 U.S.C.A.Appendix § 902(a). In the Act of October 2, 1942, 56 Stat. 765, now cited as the Stabilization Act of 1942, 50 U.S.C.A.Appendix § 963, the so-called McKellar Amendment added a proviso as follows:
"Provided further, That in the fixing of maximum prices on products resulting from the processing of agricultural commodities, including livestock, a generally fair and equitable margin shall be allowed for such processing: * * *."
The only legislative history with reference to the amendment is found in a statement on the Senate floor by Senator Brown, who had charge of the bill, explaining the amendment thus:
"Mr. President, that Amendment is in line with the policy already established by the Price Control Act, and I believe it is substantially a restatement of existing law. As I understand, the Senator from Tennessee desires that the policy be restated in the joint resolution. Personally I have no objection." (88 Cong.Rec. 7494.)
In other words, the McKellar Amendment did not modify the basic statutory standard in § 2(a) that maximum prices must be "generally fair and equitable", which would naturally mean that the prices established must allow a generally fair and equitable margin. As we held in the Gillespie case, where industry earnings under price control have remained at or above the representative peacetime level, the prices established for a particular product produced by a multiple-product industry provide a generally fair and equitable margin when they are sufficient to allow the recovery of "out-of-pocket" costs in respect to such product.
Contrary to complainant's contention, we do not deem relevant to the present case the proviso introduced by way of amendment to § 2(a) by the Stabilization Extension Act of 1944, 50 U.S.C.A.Appendix § 902(a), as follows: "Provided, That no such regulation or order shall contain any provision requiring the determination of costs otherwise than in accordance with established accounting methods." RMPR 169 contains no provision requiring changes in cost accounting methods; the industry remains free to follow its old cost accounting practices. The Administrator has merely refused to accept the cut-out test method used in the industry as the yardstick for determining whether the maximum prices are generally fair and equitable. It surely was not the intention of Congress to require the Administrator, in discharging his duties under § 2(a), to accept at face value the results indicated by whatever method of cost accounting the industry has chosen to pursue. For the same reason, we hold that the regulation does not operate "to compel changes in the business practices, cash practices or methods * * * established in any industry," contrary to the prohibition of § 2(h) of the Act as amended.
A judgment will be entered dismissing the complaint.
NOTES
[1] This represents a distortion of the normal relationship between the prices of the various grades which historically have tended to rise and fall together. Directive No. 28, issued by the Director of the Office of Economic Stabilization on January 10, 1945 (10 F.R. 522), has made some amendments to the subsidy program designed to correct this abnormal situation. The details of Directive No. 28 are not set forth in this opinion since they do not appear to affect the disposition of the case. MPR No. 574, Live Bovine Animals (Cattle and Calves), issued January 29, 1945, pursuant to said Directive No. 28, now makes it mandatory, with all the sanctions of the Act, for slaughterers to keep their payments for live cattle within the maximum permissible limits of the revised cattle stabilization ranges.
[2] In his opinion of June 21, 1944, the Administrator gives a more elaborate description of the cut-out test as follows: "The starting point in the test is the price of the steer. This is divided by the percentage yield, the average percentage of the dressed weight of carcasses of that grade to the live weight of the cattle. This would represent the cost of the carcass on a dressed weight basis; i. e., the cost of the carcass if the entire cost of the live animal were allocated to the carcass. Thus, if the cost of a thousand-pound steer were $15.00 per cwt., and it yielded 580 pounds of dressed carcass, a yield of 58%, the cost of the dressed carcass would be $15 ÷ 0.58, or $25.86 per cwt. To this quotient there is added the expense of producing the carcass. From this total cost, there is deducted a credit for byproducts; that is, those materials derived from the steer which are not a part of the dressed carcass. The amount of the credit is customarily determined by reference to the market value, or, since price control, the ceiling prices of the various byproducts in unprocessed form, without regard to the fact of whether or not the slaughterer sells them or himself processes them or uses them as raw materials for other products. The difference between the result of this calculation and the ceiling price for the carcass is the cut-out loss or gain."
[3] See also pp. 14, 46, 64, 77.
[4] In this order the Administrator recited that he deemed it "necessary and proper to receive additional evidence * * *

"(12) A statement for each of the calendar or fiscal years 1936 to 1943, inclusive, showing the gross profit, expenses and net profit in each department using beef or other products derived from cattle slaughter allocating the results to the beef department (or other control department) from the departmental profit and loss statements of all other departments, such allocation to be made in the following manner;
"(a) Set forth separately the gross profit, expenses and net profit for each department using products derived from the slaughter of cattle. The departments or departmental statements, in any combination, shall include, but are not limited to, dressed beef, beef cutting, frozen beef, pickled beef, smoked beef, fabricated cuts, sausage, canned meats, hides, casings, variety meats and edible by-products as described in Maximum Price Regulation No. 398, oleo oil and stearine, margarine, edible tallow, inedible tallow, soap, animal feed, pet food, blood, bones and hoofs, glue, gelatine, and pharmaceuticals;
"(b) Set forth the dollar value charged for raw material transferred to or purchased by each of these departments, showing separately the transfer value of products derived from Protestant's own slaughter of cattle, calves, hogs, sheep, and lambs;
"(c) Compute the percentage ratio which the dollar value of the raw materials derived from Protestant's own slaughter of cattle bears to the total dollar value of all raw material transferred to and purchased by the department, not including supplies;
"(d) The credit allocated to the dressed beef department shall be that portion of the profit or loss of the cutting, processing or by-product department computed by applying the percentage ratio as determined under sub-paragraph (c) to the net profit of the department as determined under sub-paragraph (a);
"(e) The total profit or loss thus determined for each other department shall be added to the total profit or loss of the dressed beef or other control department to determine the total results of the entire beef operations."