546

**HEINZ et al. v. BOWLES,**
**Price Administrator.**

**No. 102.**

United States Emergency Court of Appeals.
Submitted July 10, 1945.

Decided July 31, 1945.

For former opinion, see *149 F.2d 277.*

Wilbur LaRoe, Jr., of Washington, D. C., with whom· Frederick E. Brown and Arthur L. Winn, Jr., both of Washington, D. C., were on the brief, for complainants.

Jacob D. Hyman, Chief Court Review Price Branch, of Washington, D. C., with whom Richard H. Field, General Counsel, Nathaniel L. Nathanson, Associate General Counsel, Carl H. Fulda and John J. Downey, Jr., Attorneys, all of the Office of Price Administration, all of Washington, D. C., were on the brief, for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.

MAGRUDER, Judge.

Our original judgment in this case, rendered March 29, 1945 (149 F.2d 277), ordered and adjudged "that Revised Maximum Price Regulation No. 169, in so far as the maximum prices therein for beef carcasses and wholesale cuts are applicable to nonprocessing slaughterers as defined in the Directive of the Office of Economic Stabilization dated October 26, 1943, be, and it hereby is, set aside."

The Price Administrator promptly moved for vacation of the judgment to the extent that it set aside the regulation as applied to nonprocessing slaughterers, and moved further that complainants and respondent be granted leave to present directly to the court additional evidence relating to the validity of the regulation as applied to this segment of the industry. Accompanying the motion was a stipulation signed by the attorney for the complainants and by the General Counsel of the Office of Price Administration agreeing to the entry of an order vacating the judgment and reopening the case for the receipt of additional evidence. Accordingly, by order on April 2, 1945, we vacated the judgment and granted leave to either party to introduce additional evidence directly to the court.

We concluded in our previous opinion that, on the record before us, consistent losses were indicated for the nonprocessing slaughterers as a group since the cattle stabilization program was put into effect in October, 1943. This conclusion, as the Administrator points out, was not based upon evidence as to actual operating results of nonprocessing slaughterers. We started with the premise that the cut-out test, as used by the Administrator to appraise the condition of the nonprocessing slaughterers, indicated that they would necessarily incur losses if they purchased all their cattle at the tops of the stabilization ranges. We then quoted the average monthly prices for cattle at Chicago since November, 1943, for each of the four grades of cattle slaughtered by nonprocessors. Such prices, practically without exception, were higher than the upper limits of the stabilization ranges. From this we drew the inference that the nonprocessing slaughterers as a group must have experienced consistent losses throughout 1944, and into 1945 so far as figures were available. As against this inference, we rejected as insubstantial certain evidence in the record as to operating results of eleven nonprocessing slaughterers for two months of 1944 indicating that a few slaughterers made profits during this brief period.

In accepting the soundness of the cut-out test as applied to nonprocessing slaughterers, we relied upon the view originally taken by the Administrator that whereas the cut-out test was unacceptable as a criterion for determining the validity of the regulation as applied to the integrated processing slaughterers, it was "an adequate basis for testing the position of the nonprocessing slaughterers, since their actual realization from cattle is derived solely from the sale of the carcass and unprocessed by-products." We were not impressed —possibly we should have been— with the Administrator's subsequently expressed doubts as to whether the cut-out test, even as applied to nonprocessing slaughterers, adequately reflected the full

return from actual operations. We pointed out one respect in which the cut-out test, as applied by the Administrator, tended to give too favorable a picture of operating results, namely, that the Administrator's allowance of 60 cents per cwt. for killing and selling costs appeared to be too low.

As to the use of the figures of cattle costs on the Chicago market, the Administrator himself, in another connection, had insisted that these figures could be taken as fairly representative, at least with reference to the two top grades. We found in the record no indication that the nonprocessing slaughterers as a group would be able to purchase cattle at prices more favorable than the generally prevailing market prices. According to a statement by the Director of Economic Stabilization in explaining the need for the special 80-cent subsidy: "Nonprocessing slaughterers have operated profitably in the past by various means, notably skill in buying and selling and ability to command premium prices in particular markets. Increased wartime demand for beef, pressing hard against the supply, and the establishment of uniform selling prices for all sellers, have tended to eliminate the conditions under which these slaughterers could operate profitably."

Whether our conclusion was right or wrong on the record as it stood has now become an academic question. Pursuant to the leave granted by our order of April 2, 1945, the Administrator has introduced into the record additional evidence of actual operating results for the whole of 1944 in respect of 46 nonprocessing slaughterers claimed to be representative of this segment of the industry. Similar figures for the early months of 1945 have been given in respect of 22 nonprocessing slaughterers. The majority of the companies were shown to be operating profitably, and generally their operating experience was shown to be more favorable than in the prewar years 1936–1939. The

figures indicate that most of them were able, during 1944 and the early months of 1945, to purchase cattle at prices below the maxima of the respective stabilization ranges, and well below the prices at the Chicago market quoted in our previous opinion. As complainants frankly recognize, "the financial results of actual operations must overturn any calculation based upon the Chicago market prices."

Complainants have also introduced some additional evidence; but it is unnecessary to set forth and analyze in detail either the complainants' additional evidence or that of the respondent because, in their brief on reconsideration, complainants "concede further that in the absence of substantial evidence rebutting that presented by the Administrator the burden of proof shifted to the Complainants and that they have not sufficiently rebutted the Administrator's evidence regarding the year 1944, or the period since the special subsidy of 80 cents was established on November 1, 1943." It is sufficient to state our conclusion that the record now contains substantial evidence which, especially in view of recent revisions and enlargements of the subsidy payments,[1] amply supports the Administrator's contention that the regulation is presently valid even as applied to the nonprocessing slaughterers, whatever it may have been at some period or periods in the past. In this proceeding we are not called upon to render a declaratory judgment as to the validity, or invalidity, of RMPR 169 as of some date in the past. Since, on the entire record, complainants have failed to maintain their burden of establishing that the regulation is presently "not in accordance with law, or is arbitrary or capricious," we are without power to set it aside. Section 204(b) of the Emergency Price Control Act, 56 Stat. 32, 50 U.S.C.A. Appendix, § 924(b).

A judgment will be entered dismissing the complaint.

[1] See Directive No. 28 of the Office of Economic Stabilization, issued January 10, 1945 (10 F.R. 522); Directive No. 38 issued March 21, 1945 (10 F.R. 3132), and Amendment No. 1 thereto issued March 31, 1945 (10 F.R. 3561); Directive No. 41 issued April 23, 1945 (10 F.R. 4494); Directive No. 48 issued May 21, 1945 (10 F.R. 5858). Directive No. 41, supra, in Section 5 thereof, made provision for an additional subsidy in an amount necessary to make an individual slaughterer's total revenue from consolidated operations equal to his total costs of operation for the balance of his current year from May 1, 1945, or any subsequent fiscal year, in the case of any slaughterer who operated profitably during at least half the period from 1938 to 1941. Amendment 53 to RMPR 169, issued April 23, 1945 (10 F.R. 4493), increased by 25 cents per cwt. the maximum price for sales of carcass beef to war procurement agencies.