**HORNS et al. v. BOWLES, Price Administrator.**

No. 207.

United States Emergency Court of Appeals.
Heard at New York July 13, 1945.

Decided Sept. 28, 1945.

See, also 147 F.2d 57.

Morris H. Cohn and Charles S. Gaines, both of Newark, N. J., for complainants.

Jacob D. Hyman, Asst. Gen. Counsel, of Washington, D. C. (Richard H. Field, Gen. Counsel, Nathaniel L. Nathanson, Associate Gen. Counsel, and Carl H. Fulda, Atty., and Irene Kolin Lichtman, Atty., all of the Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.

MAGRUDER, Judge.

This case is another attack upon the validity of Revised Maximum Price Regulation No. 169—Beef and Veal Carcasses and Wholesale Cuts (7 F. R. 10381). In Armour & Co. v. Bowles, 1945, 148 F.2d 529, certiorari denied June 4, 1945, 325 U.S. 871, 65 S.Ct. 1411, we upheld this regulation as against the claim that the maximum prices therein established were not generally fair and equitable in their application to the industry as a whole. Particularly, we sustained the Administrator's contention that the so-called cut-out test method of cost accounting, upon which complainant's case was mainly based, was not an acceptable criterion for determining whether RMPR 169 established generally fair and equitable maximum prices. In Heinz v. Bowles, 1945, 149 F.2d 277, we first held that RMPR 169 was invalid in so far as the maximum prices therein for beef carcasses and wholesale cuts were applicable to nonprocessing slaughterers, an important segment of the industry. But upon reconsideration, on July 31, 1945, 150 F.2d 546 and after further evidence was submitted pursuant to stipulation of the parties, we concluded "that the record now contains substantial evidence which, especially in view of recent revisions and enlargements of the subsidy payments, amply supports the Administrator's contention that the regulation is presently valid even as applied to the nonprocessing slaughters, whatever it may have been at some period or periods in the past." We pointed out that in that proceeding we were not called upon to render a declaratory judgment as to the validity, or invalidity, of RMPR 169 as of some date in the past.

The present complainants filed their protest against RMPR 169 on September 2, 1944. The protest constituted a general attack upon the validity of the regulation in its application to the industry as a whole. Protestants specifically objected to the maximum prices in RMPR 169 as affecting "them and the industry" because, by reason of said maximum prices, protestants "and the industry are compelled to sell their products at a substantial loss and under great and undue hardships." Also, objection was taken to the failure of the Administrator to impose any ceiling prices upon live cattle. The protest did not contain a detailed description of the business of Fred Horns & Son nor identify it as a nonprocessing slaughterer, nor raise the narrower issue which we considered in the Heinz case, whether the regulation was valid in its application to the nonprocessing slaughterers as a distinct segment of the industry. In their brief and oral argument, complainants asserted that they are nonprocessing slaughterers. A statement by counsel for complainants, filed in the protest proceedings, asserts that Fred Horns & Son had been ruled by the Defense Supplies Corporation to be ineligible to receive the special differential subsidy payable to nonprocessing slaughterers pursuant to the Directive of the Office of Economic Stabilization issued October 26, 1943 (8 F. R. 14641), because they "failed to slaughter cattle for a period of six consecutive months during the year of 1942, which Defense Supplies Corporation made a condition precedent." This assertion is not substantiated in the record. If, as may be inferred from one of the affidavits filed by complainants, they are engaged in fabricating beef cuts for sale to hotels and restaurants, they would not be eligible for the subsidy payable to nonprocessing slaughterers as defined in the aforesaid Directive. In any event, the protest poses no issue as to the validity of the regulation as applied to some particular group of small, nonintegrated slaughterers who for one reason or another are disentitled to receive the special subsidy.

On October 9, 1944, protestants submitted two affidavits in support of their protest. We shall refer later to the contents of these affidavits. By order on November 4, 1944, the Administrator incor-

porated into the record extensive statistical material in support of the validity of the regulation. This order afforded protestants an opportunity within thirty days to submit in affidavit form such other relevant evidence, including evidence in rebuttal of the material incorporated into the record by the Administrator, as the protestants might desire to present. Specifically, the order invited the protestants to file their profit and loss statements for each of the fiscal or calendar years ending in 1936 through 1943 and for the first nine months of the fiscal or calendar year 1944; also, a detailed statement of the scope of protestants' meat operations, including data showing the total dollars of net profit or loss in beef operations in the years 1936 through 1943 and for the first nine months of 1944, as determined by the protestants' method of accounting, together with a description of that method. Fred Horns & Son filed no rebuttal evidence. In a statement submitted by counsel, it is recited that Fred Horns & Son did not desire to avail itself of the opportunity of presenting its profit and loss statements for the years 1936 through 1944 "for the reason that its operations during the years prior to the war were unrelated and entirely dissimilar to its operations since the war and for the further reason that its protest is based upon the calculated cut-out test of steers or cattle." The statement also recited that Fred Horns & Son "reserves the right to introduce such other evidence as it may deem proper and material at the hearing to be fixed by the Administrator and that subpoenas may issue to persons designated by the protestant whom it desires to produce as witnesses for the purpose of proving certain material facts germane to its protest." This latter recital the Administrator construed as a request for the reception of oral testimony, which request he denied on the ground that protestants had made no showing as required by § 37(a) of Revised Procedural Regulation No. 1, that the filing of written evidence would not permit the fair and expeditious disposition of the protest. There is nothing in the record to indicate that the Administrator committed any abuse of discretion in denying this request. By order of the Administrator, the protest was sent to a Board of Review for consideration. This board, after hearing oral argument by the protestant in support of its protest, filed its report on January 19, 1945, recommending that the protest be denied. By order issued February 7, 1945, the Administrator denied the protest "insofar as relief has not been granted by the issuance of Maximum Price Regulation No. 574." [1]

The two affidavits referred to above constituted the only evidence offered by complainants in support of their protest. The first was an affidavit by Joseph J. Reiss, a certified public accountant who affirms that he has an intimate knowledge of the cattle market and of the costs of operation, maintenance and general overhead and other factors in connection with the slaughtering of cattle and the sale and distribution of meats. The substance of his affidavit is summarized by the Board of Review as follows: "Protestant has presented a 'cut-out' test which involves certain assumptions as to the average weight of a beef animal and the yield to be obtained therefrom by selling cuts from the carcass. It appears from the affidavit of the accountant who prepared the test that this cut-out test was not based upon any operations for the Protestant for any given period, but was rather a composite 'based on average figures of typical slaughterhouses and wholesalers located in Zone 9.' It does not appear that the cut-out test did actually reflect the real costs of operation of the sellers involved. The test did not reveal income from transportation or delivery differentials, from selling Kosher meat, or from selling to restaurants and similar establishments at the higher prices permitted by the Regulation in which business Protestant and many others similarly situated are engaged. Neither was the flat subsidy nor the differential non-processing subsidy credited in the test. We have been forced to the conclusion that the test in question was synthetic in nature and that it may not be relied upon as actually reflecting either Protestant's or any other group's actual costs of operation under Revised Maximum Price Regulation No. 169."

In the Administrator's brief, other inaccuracies in the cut-out tests as made by Mr. Reiss are pointed out. It is not necessary to state these in detail, for it is obvious that the Reiss affidavit standing by itself is not sufficient to sustain a general attack upon the validity of RMPR 169.

---

[1] This regulation, issued January 29, 1945, 10 F.R. 1270, imposed an over-riding maximum price on live cattle.

See Armour & Co. v. Bowles, Em.App., 1945, 148 F.2d 529. In declining to submit to the Administrator their profit and loss statements and other data requested by the Administrator, complainants have indeed failed to make a showing even of individual hardship as a result of the operation of the regulation. The second affidavit, by Roy M. Cohen, managing and technical editor of a trade publication in the meat industry, expresses the opinion that the maximum prices in RMPR 169 "are far out of line and below the cost of production", and that no slaughterer "can break even at the prices fixed by the regulations based upon the current price of live cattle." Also, Mr. Cohen affirms that, on the basis of an individual survey made by him of the cost of cattle, the cost of production of a carcass of wholesale and of fabricated cuts, "the figures produced by Mr. Reiss showing a typical case of the purchase and sale of a steer in wholesale cuts is substantially correct * * *". We cannot set aside a price regulation on the basis of such general statements. Mr. Cohen goes on to state that he is prepared to testify in support of his statements "with details, facts, and figures too voluminous to set forth in this affidavit." But, as indicated above, protestants were afforded an opportunity to submit such supporting facts and figures in affidavit form and failed to do so, and the Administrator committed no error in declining to receive such statistical evidence in the form of oral testimony.

After the oral argument before us on July 13, 1945, complainants obtained leave to submit a supplemental brief. In this brief, complainants referred to our ultimate conclusion in Heinz v. Bowles, supra, upon reconsideration, that RMPR 169 was "presently valid even as applied to the non-processing slaughterers, whatever it may have been at some period or periods in the past." 150 F.2d 546, 547. It is stated that complainants are under indictment on charges of having made sales at prices in excess of the applicable maximum prices during the months of November and December, 1943, and January, February and March, 1944. "The paramount question, insofar as complainants are concerned, is therefore, was the regulation (RMPR No. 169), insofar as it related to maximum prices of beef, valid during the five months prior to March 30, 1944?" The argument is advanced that the regulation must have been invalid in that earlier period because it was found necessary subsequently to take various corrective measures, that is, to put a ceiling on the price of live cattle and to make certain increases in the subsidy payments.

On this record we must necessarily decline complainants' request for a retroactive declaration that the regulation was invalid during the aforesaid five-months' period. In Thomas Paper Stock Co. v. Bowles, 1944, 148 F.2d 831, 837, we said that the primary purpose of the protest procedure provided in § 203 of the Act, 50 U.S.C.A.Appendix § 923, "is to afford to a person subject to a provision of a regulation or order which he believes to be invalid the opportunity to present his objections thereto to the Administrator and to request its modification or rescission in order that he may not have to obey it in the future. This is not to say that in a protest attacking the validity of a regulation or order and asking for its modification or rescission for the future the protestant may not also ask that the relief thus requested be made retroactive so as to be available for his defense in an enforcement proceeding. Nor is it to say that the Administrator may not grant such a request in a proper case." However, the protest filed by Fred Horns & Son made no such request for retroactive relief. Nowhere in the course of the protest proceedings did protestants refer to any past period in respect to which it was vital to have a retroactive determination of the validity of the regulation. Under § 204(a) of the Act, 50 U.S.C.A.Appendix § 924(a), we are precluded from considering objections to the regulation which were not set forth in the protest and thus made an issue in the administrative proceedings. Furthermore, in their complaint filed in this court, complainants asked only for prospective relief. In addition to that, even if the issue now belatedly sought to be raised were properly before us, the evidence in the present record is insufficient to warrant a declaratory judgment that RMPR 169 was invalid in the five-months' period prior to March 30, 1944, either generally or as applied to some particular segment of the industry.

A judgment will be entered dismissing the complaint.