155 F.2d 525 (1946)
EARL C. GIBBS, Inc.,
v.
DEFENSE SUPPLIES CORPORATION et al.
No. 226.
United States Emergency Court of Appeals.
Heard December 6, 1945.
Decided May 8, 1946.
Arthur L. Winn, Jr., of Washington, D. C. (Wilbur La Roe, Jr., and Frederick E. Brown, both of Washington, D. C., on the brief), for complainant.
John C. Erickson, of Washington, D. C. (John D. Goodloe and James L. Dougherty, both of Washington, D. C., on the brief), for respondents.
Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.
Heard at Washington, December 6, 1945.
MAGRUDER, Judge.
This complaint presents a challenge to a provision of Amendment No. 2 (9 F.R. 1820) to Regulation No. 3 (8 F.R. 10826) issued by the Defense Supplies Corporation, a wholly owned subsidiary of the Reconstruction Finance Corporation (6 F.R. 2972).
Amendment No. 2 established a special subsidy of 80 cents per cwt. to non-processing slaughterers of cattle and attached certain conditions to the payment of such subsidy. To be eligible for the special subsidy, a non-processing slaughterer, as defined, must be an "unaffiliated slaughterer", that is, it must not "own or control", or be "owned or controlled by", a "processor or purveyor of meat." The phrase "own or control" is defined as meaning "to own or control directly or indirectly a partnership equity or in excess of ten percent of any class of outstanding stock or to have made loans or advances in excess of five percent of the other person's monthly sales." Defense Supplies Corporation *526 ruled that complainant, which in other respects qualified for the special subsidy to non-processing slaughterers, was not eligible to receive such subsidy from November 1, 1943, to November 30, 1944, because during that period it was indebted to Hughes Provision Company in an amount in excess of five per cent of its monthly sales. Hughes Provision Company is both a processor and purveyor of meat; it is engaged in the slaughter of meat animals, the processing of meat products, and the sale thereof both at wholesale and retail.
Complainant maintains that Amendment No. 2 is arbitrary and capricious and not in accordance with law in so far as it sets up what is in effect an irrebuttable presumption of control predicated upon the existence of a loan in the amount prescribed, and thus renders ineligible for the special subsidy a non-processing slaughterer who is prepared to prove to the hilt that it is in fact a wholly independent business entity, that its business is in no way affiliated with or integrated with the business of a processor or purveyor of meat, and that it derives no profit or other financial benefit, either direct or indirect, from the processing of the raw by-products of cattle slaughter.
A motion by respondents to dismiss the complaint for lack of jurisdiction was denied by us on the authority of Illinois Packing Co. v. Snyder, Em.App. 1945, 151 F.2d 337.
From the outset, the OPA and other governmental agencies concerned have been beset with difficulties in the formulation and administration of a program of price control for the meat industry. The details are set forth in our opinion in Armour & Co. v. Bowles, Em.App.1945, 148 F.2d 529, certiorari denied, 1945, 325 U.S. 871, 65 S.Ct. 1411, 89 L.Ed. 1989.
In June, 1943, as part of the President's hold-the-line policy (Exec. Order 9328, 50 U.S.C.A.Appendix § 901 note, 8 F.R. 4681), the maximum prices of carcass beef and wholesale cuts, by order of the Economic Stabilization Director, were reduced approximately 10 per cent (Amendment No. 15 to RMPR 169, 8 F.R. 7675). By Regulation No. 3 (8 F.R. 10826) issued by Defense Supplies Corporation, this reduction was compensated for by the payment of corresponding subsidies to slaughterers so that they, in turn, could continue to pay the same prices as before for live cattle. At this time no attempt was made to impose controls on the movement of live cattle prices. Subsequently, pursuant to a Directive of the Economic Stabilization Director issued October 25, 1943 (8 F.R. 14641), the payment of this general subsidy to all cattle slaughterers was tied in with an elaborate cattle stabilization plan designed to operate as an indirect control of cattle prices so as to give needed relief to the meat industry.
It was recognized that the non-processing slaughterers, who produced about 15 per cent of the national yield of carcass beef, were in a less favorable position than the integrated packers who derived important profits through the utilization of by-products of cattle slaughter in further processing operations. The Price Administrator deemed it inadvisable, however, to establish higher ceiling prices for the non-processing slaughterers, as he might have done pursuant to his authority in § 2(c) of the Act, 50 U.S.C.A.Appendix § 902(c), to establish in price regulations such classifications, differentiations, and reasonable exceptions as in his judgment are necessary and proper in order to effectuate the purposes of the Act. He did not do this, because higher wholesale ceiling prices for non-processing slaughterers alone would have destroyed the foundation upon which were based the uniform dollars-and-cents retail prices regarded by him as essential to effective control of meat prices. Instead, an alternative program for the relief of non-processing slaughterers was worked out by the government agencies concerned. The Office of Economic Stabilization, in the aforesaid Directive of October 25, 1943, directed Defense Supplies Corporation to amend its Regulation No. 3 so as to provide for the payment to non-processing slaughterers of a special additional subsidy affording them a benefit equivalent to what they would have obtained by higher ceiling price differentials in their favor.
Authority for the payment of subsidies as a part of the program of price control *527 was found in § 2(e) of the Emergency Price Control Act, 56 Stat. 26. See Illinois Packing Co. v. Bowles, Em.App.1945, 147 F.2d 554. Section 2(e) reads in part as follows: "Whenever the Administrator determines that the maximum necessary production of any commodity is not being obtained or may not be obtained during the ensuing year, he may, on behalf of the United States, without regard to the provisions of law requiring competitive bidding, buy or sell at public or private sale, or store or use, such commodity in such quantities and in such manner and upon such terms and conditions as he determines to be necessary to obtain the maximum necessary production thereof or otherwise to supply the demand therefor, or make subsidy payments to domestic producers of such commodity in such amounts and in such manner and upon such terms and conditions as he determines to be necessary to obtain the maximum necessary production thereof: Provided, That in the case of any commodity which has heretofore or may hereafter be defined as a strategic or critical material by the President pursuant to section 5d of the Reconstruction Finance Corporation Act, as amended, such determinations shall be made by the Federal Loan Administrator, with the approval of the President, and, notwithstanding any other provision of this Act or of any existing law, such commodity may be bought or sold, or stored or used, and such subsidy payments to domestic producers thereof may be paid, only by corporations created or organized pursuant to such section 5d; * * *."
Meat having been defined by the President to be a "strategic or critical material", the effect of the proviso in § 2(e) above quoted was to lodge in the Federal Loan Administrator, with the approval of the President, authority to make the determination of the need for making subsidy payments to the producers of this commodity. Defense Supplies Corporation, a corporation created pursuant to § 5d of the Reconstruction Finance Corporation Act, as amended, 15 U.S.C.A. § 606b (6 F.R. 2972), was empowered to act as paying or disbursing agent in respect of such subsidies.
Sections 1 and 2 of the Act of October 2, 1942, now cited as the Stabilization Act of 1942, 56 Stat. 765, 50 U.S.C.A.Appendix §§ 961, 962, authorized the President to issue general orders stabilizing prices, wages, and salaries affecting the cost of living, such stabilizations, so far as practicable, to be on the basis of the levels which existed on September 15, 1942; and gave him broad power to delegate his authority under the Act to such department, agency or officer as he might direct. By Executive Order 9250 issued October 3, 1942, 50 U.S.C.A.Appendix § 901 note (7 F.R. 7871), the President delegated such authority to the Office of Economic Stabilization. In Title I of this Executive Order, the Director of the Office of Economic Stabilization was directed to formulate and develop a comprehensive national economic policy with respect to prices, rents, wages, salaries, profits, rationing, subsidies, and all related matters, with a view to stabilizing the cost of living in accordance with the Act of October 2, 1942. To give effect to this comprehensive national economic policy, it was provided that "the Director shall have power to issue directives on policy to the Federal departments and agencies concerned"; that the administration of activities related to the national economic policy "shall remain with the departments and agencies now responsible for such activities, but such administration shall conform to the directives on policy issued by the Director." In Title V of Executive Order 9250, the Economic Stabilization Director was specifically authorized to direct "the Reconstruction Finance Corporation, and other corporations organized pursuant to Section 5d of the Reconstruction Finance Corporation Act, as amended, to use [their] authority to subsidize and to purchase for resale, if such measures are necessary to insure the maximum necessary production and distribution of any commodity, or to maintain ceiling prices, or to prevent a price rise inconsistent with the purposes of this Order."
Thus the authority to formulate and administer subsidy programs remained where it had been placed by § 2(e) of the Emergency Price Control Act; with this qualification, *528 however, that the Price Administrator, the Federal Loan Administrator, and Defense Supplies Corporation, were obliged to conform to the general line of policy laid down in directives of the Economic Stabilization Director pursuant to his overriding authority as conferred upon him by the Executive Order.
In the above-mentioned Directive of the Economic Stabilization Director issued October 25, 1943, it was provided as follows:
"5. Slaughterers who during the year 1942, or a representative portion thereof, sold and who currently sell 98% or more of the total dressed carcass weight of cattle slaughtered by them in the form of carcasses, wholesale cuts, frozen boneless beef (Army specifications) (carcass equivalent) or ground beef, shall be paid in addition to the payments authorized by Regulation No. 3 of Defense Supplies Corporation (Livestock Slaughter Payments), the amount of $0.80 per cwt. of cattle slaughtered during the month for which such payments are made.
"6. Defense Supplies Corporation is directed to amend Regulation No. 3 (Livestock Slaughter Payments) in accordance with this Directive."
This was all that the Directive provided with reference to the special subsidy to non-processing slaughterers, though it contained other provisions dealing with the general subsidy payable to all cattle slaughterers. In a public statement issued by the Director, the need for this special subsidy was explained in detail: Despite the generally integrated character of the meat packing industry, there is a substantial number of slaughterers, responsible for approximately 15 per cent of the total beef supply, who perform no processing operations. Returns from processing operations, which have increased the earnings of the great bulk of the industry, have not been open to the non-processing slaughterers as a group; in consequence they have suffered under the existing wholesale ceilings. A higher ceiling price for the non-processing slaughterers alone would have destroyed the structure of uniform dollars-and-cents prices which experience has shown to be essential for effective control of meat prices. Higher ceiling prices for the industry generally would have caused a major break in the hold-the-line program. A reduction in live cattle prices would have added unnecessarily to the profits of the bulk of the packing industry and would have impeded the maximum production of cattle. The only practicable alternative was therefore the payment of a differential subsidy to the non-processing slaughterers, who would otherwise be forced out of business, depriving the nation of slaughtering facilities needed to assure the full utilization of existing meat supplies.
In compliance with the Directive, Defense Supplies Corporation on October 30, 1943, amended its subsidy regulation so as to provide for the payment of the special subsidy to non-processing slaughterers. Relevant portions of its Amendment No. 2, already summarized at the outset of this opinion, are set forth in the footnote.[1]
*529 Defense Supplies Corporation furnished a form entitled "Statement Establishing Eligibility of Extra Compensation Under Amendment No. 2 to Regulation No. 3 of Defense Supplies Corporation", to be filled in and filed by cattle slaughterers claiming to be eligible for the special subsidy. The form was filled in by complainant, with all the information called for correctly stated, and was filed on December 18, 1943. The form required a disclosure of "all corporations in which the applicant now owns or controls directly or indirectly 10% or more of any class of outstanding stock", and a disclosure of "all persons who now own 10% or more of any class of outstanding stock of the applicant." It did not, however, call for any disclosure of outstanding loans. Thereafter, complainant received, upon its claim made each month, the extra compensation of 80 cents per cwt. on cattle slaughtered on and after November 1, 1943, through October 31, 1944, amounting in all to $218,865.12. The extra compensation claimed for November, 1944, amounted to $22,120.56, but this has not been paid.
In the latter part of November, 1944, Defense Supplies Corporation notified complainant that it was and had been ineligible to receive the extra compensation under Amendment No. 2 because complainant was "owned or controlled" by a processor purveyor of meat, within the meaning of the amended regulation, by virtue of the fact that complainant was indebted to Hughes Provision Company in the sum of $75,000, such indebtedness, which was in excess of 5 per cent of complainant's monthly sales, being secured by a mortgage upon complainant's plant. Thereafter, but prior to December 1, 1944, complainant obtained a loan from a bank and discharged in full its indebtedness to Hughes Provision Company, which released the mortgage on the plant. Thereupon, the eligibility of complainant to receive the extra compensation was acknowledged by Defense Supplies Corporation and complainant has been credited with the subsidy of 80 cents per cwt. on all cattle slaughtered by it since December 1, 1944. However, in order to obtain payment of the special subsidy for the future, complainant was required to refund to Defense Supplies Corporation the said sum of $218,865.12, with interest at 4 per cent.
On March 24, 1945, complainant filed with Defense Supplies Corporation its formal protest against Amendment No. 2 in so far as it failed to provide for the payment of the special subsidy on cattle slaughtered by independent slaughterers who were and are in fact unaffiliated with and not owned or controlled by any processor or purveyor of meat, and who did not and do not own or control any such processor or purveyor. The protest, which was sworn to by the president and vice president of complainant, sets forth that protestant is and has been an independent slaughterer of beef unaffiliated with and not owning or controlling, or owned or controlled by, any processor or purveyor of meat; that protestant has, and since May, 1942, has had, no source of revenue or profit from the beef carcasses which it produces, or any financial benefit from such production, direct or indirect, except that obtained from the sale of such carcasses at the maximum prices provided in RMPR 169 and from the cattle slaughter subsidy payments received from the Defense Supplies Corporation; that neither protestant nor any of its officers, directors or stockholders has had any financial or other interest, direct or indirect, in Hughes Provision Company or any other processor *530 or purveyor of meat. The circumstances of the loan from Hughes Provision Company, which originally was made in 1937, are fully set forth. It is stated that protestant purchases no meat produces from Hughes Provision Company; and that the purchases by Hughes Provision Company from protestant have been negligible in amount, with transactions conducted at "arm's length" in all respects the same as in case of sales to other customers.
After receipt of the protest, Defense Supplies Corporation, without any challenge of the facts set forth therein, wrote a letter to protestant under date of April 23, 1945, which was in effect a denial of the protest. The letter simply stated that the provisions of the amended subsidy regulation relating to affiliation "are in all respects reasonable, duly authorized and valid"; and that during the period November 1, 1943, to November 30, 1944, protestant was indebted to a processor or purveyor of meat in an amount in excess of 5 per cent of its monthly sales and was not, within the meaning of the regulation, "an unaffiliated slaughterer" entitled to receive extra compensation of 80 cents per cwt. Thereupon Earl C. Gibbs, Inc., filed the pending complaint in this court.
We do not think that the affiliation provisions in Amendment No. 2 can be held unauthorized and invalid merely on the ground that they establish additional conditions on eligibility for the special subsidy beyond those prescribed in the Directive of October 25, 1943. As above explained, the basic authority to provide for the payment of meat subsidies is vested in the Federal Loan Administrator by § 2(e) of the Emergency Price Control Act. In exercising such authority, the Federal Loan Administrator must conform to "directives on policy" issued by the Economic Stabilization Director; beyond that, however, the detailed implementation of the subsidy program remains a function of the Federal Loan Administrator. The Directive of October 25, 1943, laid down the policy of paying a special compensatory subsidy to non-processing slaughterers. As explained by the Economic Stabilization Director in his public statement, the general purpose was to afford relief to a group of slaughterers who do not derive profits from further processing operations. It is thus consistent with the policy of the Directive to deny the special subsidy to a non-processing slaughterer affiliated with and controlled by a processing slaughterer  otherwise the benefit of the special subsidy would flow to persons not intended to be benefited and not needing the special relief. Indeed, complainant concedes: "The requirement that the non-processing slaughterer must not own or control, or be owned or controlled by, a processor may be implied from the language of the directive and its purpose."
It is true that Defense Supplies Corporation is merely a paying or disbursing agent, and that authority to formulate a program of meat subsidies is vested in the Federal Loan Administrator, subject to the overriding authority of the Director of Economic Stabilization. Amendment No. 2, containing the affiliation provisions, was issued by the Defense Supplies Corporation. We are not at liberty to consider a possible technical objection that the conditions of eligibility for the special subsidy, as prescribed in Amendment No. 2, should have been traced to a determination made by the Federal Loan Administrator, for no such objection was contained in the protest. In addition, it would be highly unrealistic to suppose that Defense Supplies Corporation, which falls under the supervision and control of the Federal Loan Administrator, 53 Stat. 1429, 1430, 5 U.S.C.A. following section 133 went off on a frolic of its own in this matter.
In Armour & Co. v. Bowles, Em. App.1945, 148 F.2d 529, certiorari denied 325 U.S. 871, 65 S.Ct. 1411, 89 L.Ed. 1989, we upheld the general validity of RMPR 169. But the non-processing slaughterers as a group presented a distinct problem, and from the movement of cattle prices it became apparent that some form of special relief would have to be provided for this important segment of the industry  hence the extra subsidy of 80 cents per cwt., without which RMPR 169 would have become invalid as to such groups of slaughterers. See Heinz v. Bowles, Em.App. *531 1945, 149 F.2d 277, and, on reconsideration, Em.App.1945, 150 F.2d 546. As we pointed out in Illinois Packing Co. v. Snyder, 1945, 151 F.2d 337, 339, it is hardly accurate to describe the meat subsidies as a gratuity or bounty. "Such subsidies are closely articulated with the price control program, and, as contemplated by Congress, may operate as compensatory in nature so as to validate a lower level of legal maximum prices than otherwise would be permissible under the standards laid down in the Price Control Act for the guidance of the Price Administrator." If a price regulation prescribed a maximum price for a commodity as applicable generally to a particular class of sellers, and then without any rational basis of differentiation prescribed a lower maximum price as applicable to an individual member or small group of that class, the latter provision would constitute an arbitrary and capricious discrimination. The same type of discrimination may be created in the establishment of subsidies as part of the price control program, as where, in lieu of a higher level of maximum prices, a subsidy is provided for a particular class of sellers, but a provision of the subsidy regulation arbitrarily excludes a member of the class from participation in the subsidy. Whether such discrimination is brought about in the price regulation itself or in an interrelated subsidy regulation, in either case this court has jurisdiction to set aside the discriminatory provision as being arbitrary and capricious.
The ultimate question in the case at bar therefore comes down to this: Whether it can be said that there was a rational basis for the provision in Amendment No. 2 absolutely denying the special subsidy to a non-processing slaughterer who is indebted to a processor or purveyor of meat in an amount in excess of 5 per cent of its monthly sales.
Respondents point out that the benefits of integration between non-processing slaughterers and others in the meat business can be achieved in whole or in part by the person in control, whether the control is based upon stock ownership or upon a dominating position as creditor. Since members of the meat industry are not bankers by trade, it is not unreasonable to assume that loans advanced by one member of the industry to another are in most cases not motivated by the sole purpose of making an investment of funds to earn interest. The packing industry is characterized by a rapid turnover of capital, and debts of substantial size as compared to sales are apt to be sufficiently burdensome to offer to the creditor a potential means of control.
The foregoing considerations would undoubtedly make it reasonable to provide that the existence of a loan of the character described is a presumptive ground of ineligibility for the special subsidy. But complainant urges that it is arbitrary and unreasonable to make this an absolute disqualification and to deny to the borrower the opportunity of satisfying the subsidy-paying agency that, notwithstanding the existence of the loan, the creditor in the particular case is not in control and the non-processing slaughterer's business is in fact wholly independent of and not integrated with the business of the creditor.
But this suggestion would introduce difficult factual issues as to degrees of control and degrees of integration. Control by a creditor depends upon his ability to exert economic pressure rather than upon the terms of the loan contract, and an apparent showing of lack of control would not be easily susceptible of disproof. Even if all the facts were fully and correctly disclosed to the subsidy-paying agency, there would inevitably arise marginal cases where the line between eligibility and ineligibility would be difficult to draw. Furthermore, as respondents point out, if the financial position of the debtor is such that the disqualifying debt is not so burdensome as to subject the debtor to the control of his creditor, it is reasonable to assume that the debtor might be able to remove the disqualification by refinancing the debt in whole or in part outside the meat industry. Complainant did that in the present case within a few days after it was notified that the existence of the debt to Hughes Provision Company rendered it ineligible to receive the subsidy. The regulation can therefore hardly be said to be unreasonable *532 in its application to a person in complainant's situation. We cannot in this case hold that the challenged provision of Amendment No. 2 is arbitrary and capricious or inappropriate for carrying into execution the general policy laid down in the Directive of October 25, 1943.[2] As explained in Heinz v. Bowles, Em.App. 1945, 149 F.2d 277, 150 F.2d 546, some special provision had to be made for the non-processing slaughterers as a group. This has been done. It is possible that the application of Amendment No. 2 might result in hardship to an individual non-processing slaughterer who, though in fact not controlled by his creditor, is for some reason or other unable to refinance the loan outside the meat industry and thus to remove the disqualification. But this does not necessarily render the regulation invalid, for considerations of administrative workability may render it impracticable to provide complete individualization of treatment.
A judgment will be entered dismissing the complaint.
McALLISTER, Judge (dissenting).
Under the maximum prices fixed for meat, the large affiliated slaughterers were able to operate at a profit by reason of their processing of various meat products. Non-processing independent slaughterers were unable to operate profitably with such maximum prices, because they could not make up their losses on sales of meat through the processing of other meat products. To prevent this large and important group of independents from going out of business, it was necessary either to raise the price ceilings which all classes of slaughterers might obtain for their meat, or to subsidize the independent slaughterers who were operating at a loss. The payment of subsidies to such independents was the course decided upon because it was considered that a rise in maximum prices was a threat to the "hold the line" policy of the government, directed toward holding down the cost of living. Of course, in carrying out the subsidy program, it was important to avoid the payment of such subsidies to any except non-processing independent slaughterers, and to prevent the larger affiliated slaughterers and packers from directly or indirectly securing the benefit of the subsidy through ownership or control of the non-processing slaughterers.
But Amendment 2 to Regulation No. 3 issued by the Defense Supplies Corporation *533 in this case, providing that the existence of a loan from a purveyor or producer of meat to a slaughterer in an amount of more than 5% of the other's monthly sales creates a conclusive presumption of ownership or control of the slaughterer by the processor, seems unreasonable. While it is said in the accompanying opinion that a showing of lack of control in a given case would not be easily susceptible of disproof, that consideration appears, in no way, to require the conclusive presumption established by the Amendment to the Regulation. If a prima facie presumption of ownership or control, in the case of such a loan, were established by the Regulation, the burden would be upon the claimant, rather than upon the Administrator, to show absence of such control, and such a requirement would, unquestionably, be fair and reasonable. But it would be unreasonable to deny complainant any opportunity to prove that it was unaffiliated with a processor, or, while admitting it was not owned or controlled by a processor, to refuse the subsidy payment, merely because of the conclusive presumption promulgated by the administrative agency. Accordingly, I am of the opinion that the conclusive presumption of ownership or control provided by the Amendment to the Regulation  rather than a prima facie presumption  is arbitrary and unreasonable, and should be set aside.
NOTES
[1] "Pursuant to a directive issued by the Office of Economic Stabilization on October 25, 1943 (8 F.R. 14641), Regulation No. 3 of Defense Supplies Corporation is hereby amended by adding a new § 7003-14, as follows:

"§ 7003.14 Extra compensation for non-processing slaughterers of beef  (a) Definitions. (1) `Non-processing slaughterer of beef' means an unaffiliated slaughterer as hereinafter defined during six consecutive months of 1942, sold, and who currently sells, 98% or more, measured in dressed carcass weight, of the total beef produced from cattle slaughtered by him in all his establishments, in the form of carcasses, wholesale cuts, boneless beef or ground beef.
"(2) `Unaffiliated slaughterer' means a slaughterer who does not own or control a processor or purveyor of meat, and who is not owned or controlled by a processor or purveyor of meat. `Unaffiliated slaughterer' shall not include any institution, representative or agency of Federal, State or local governments.
"(3) `Processor or purveyor of meat' means a person who processes fresh beef or sells or dispenses fresh or processed meat or products containing meat, at wholesale or at retail, or in a hotel, restaurant or other eating establishment.
"(4) `Own or control' means to own or control directly or indirectly a partnership equity or in excess of ten percent of any class of outstanding stock or to have made loans or advances in excess of five percent of the other persons' monthly sales.
* * * * * * * *
"(c) Filing claims. (1) Claims for extra compensation shall be filed in the same manner as, for the same period as, and with, the applications for payment provided for in §§ 7003.1 through 7003.5 of this regulation.
* * * * * * * *
"(d) Payment of claims. Defense Supplies Corporation will make payment on approved claims for extra compensation at the rate of .8 cents a pound on the same amount of live weight of cattle slaughtered on and after November 1, 1943, on which payments are made to the applicant under §§ 7003.1 through 7003.5 of this regulation. * * *"
[2] The language of Amendment No. 2 clearly and unambiguously rendered complainant ineligible to receive the special subsidy so long as the debt to Hughes Provision Company remained outstanding. As stated earlier in this opinion, complainant was therefore ineligible during the period November 1, 1943, through October 31, 1944. It seems, however, that complainant received payment of the subsidy during this period in entire good faith, being misled by the form furnished by Defense Supplies Corporation entitled "Statement Establishing Eligibility for Extra Compensation Under Amendment No. 2 to Regulation No. 3 of Defense Supplies Corporation", which, quite inexplicably, failed to call for a disclosure of outstanding loans. Therefore complainant will apparently be entitled to relief under the remedial provision of § 2 of Public Law 88, approved June 23, 1945, 15 U.S.C.A. § 606b note, reading as follows:

"Any slaughterer who heretofore or hereafter shall have received extra compensation payments under Livestock Slaughter Payments Regulation Numbered 3 of Defense Supplies Corporation (adopted pursuant to directives of the Director of Economic Stabilization) when such slaughterer was not in a class eligible for such extra compensation payments, shall be relieved, in whole or in part, of obligation to repay the amount thereof and shall be entitled to receive, in whole or in part, the amount of such extra compensation payments repaid by such slaughterer to, or withheld by Defense Supplies Corporation on account of such extra compensation payments, to the extent that it is determined by the Director of Economic Stabilization, or any agency of the Government authorized by him, that it would be inequitable for Defense Supplies Corporation to require repayment by such slaughterer or to retain the amount so repaid or withheld, provided such Director or agency also determines that such slaughterer believed reasonably and in good faith that he was eligible to receive such extra compensation payments: Provided, That any determination by such Director or agency under this section shall be reviewable by the Emergency Court of Appeals under such rules as such court may prescribe."