193 F.2d 1010
 DANZ
v.
RECONSTRUCTION FINANCE CORP.
 No. 557.
 United States Emergency Court of Appeals
 Heard at Philadelphia, Pa., September 21, 1951.
 Decided February 4, 1952.
 
 Alexander Boskoff, Washington, D. C., for complainant.
 George Arthur Fruit, Attorney, Department of Justice, Washington, D. C., with whom J. Gregory Bruce, Attorney, Department of Justice, Washington, D. C., was on the brief, for respondent.
 Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.
 MAGRUDER, Judge.
 
 
 1
 Complainant, doing a cattle slaughtering business under the name San Mateo Meat Company, received from the Reconstruction Finance Corporation in 1946 the sum of $4,587.85 on his claim for the so-called special profit subsidy provided by § 7003.15(b) (3) of respondent's Revised Regulation No. 3 — Livestock Slaughter Payments,[1] in compliance with § 2 of Directive 90 of the Office of Economic Stabilization (10 F.R. 14743). By a determination or order of respondent, on September 29, 1947, it was ruled that there had been an overpayment on the claim to the extent of $2,827.33, which complainant was obliged to refund. Complainant filed a protest against this order, which respondent formally denied by letter dated May 18, 1951. Thereafter the pending complaint was duly filed in this court. For the basis of our jurisdiction in this class of cases see Earl C. Gibbs, Inc., v. Defense Supplies Corp., Em.App., 1946, 155 F.2d 525; Merchants Packing Co. v. R. F. C., Em.App., 1949, 176 F.2d 908, 912-13; Evergreen Meat Co. v. R. F. C., Em.App., 1951, 188 F.2d 368, 373-375.
 
 
 2
 Various aspects of the livestock slaughter subsidy program initiated under § 2(e) of the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 902(e), have been before this court in earlier cases. See Merchants Packing Co. v. R. F. C., supra, and cases cited therein at page 910.
 
 
 3
 Cattle slaughter subsidy payments were originally established, effective June 7, 1943, by Regulation No. 3 issued by Defense Supplies Corporation (8 F.R. 10826). The purpose was to compensate slaughterers for a roll-back of 10 per cent in the maximum prices of carcass beef and wholesale cuts. See Earl C. Gibbs, Inc., v. Defense Supplies Corp., Em.App., 1946, 155 F.2d 525, 526. There was, however, at this time no attempt to impose direct controls on the movement of live cattle prices because of what was believed to be the practical difficulty of grading cattle on the hoof and particularly of determining the grade of carcass beef which any individual animal would produce.
 
 
 4
 The Office of Economic Stabilization, which had been given overriding authority over the entire subsidy and stabilization program, issued a Directive on October 25, 1943 (8 F.R. 14641) setting up a so-called cattle stabilization plan which sought to impose indirect controls upon live cattle prices by depriving the buyer-slaughterer of his subsidy to the extent that his total monthly payments for all grades of cattle purchased exceeded the price ranges established for the various grades. These price ranges were fixed with a view to bringing into proper relationship the prices for live cattle and the prices for beef carcasses and wholesale cuts established in Revised Maximum Price Regulation 169 (7 F.R. 10381). The method of calculating this maximum permissible cost which a buyer could incur in the purchase of cattle during a monthly accounting period without diminution of subsidy was summarized by us in Evergreen Meat Co. v. R. F. C., 188 F.2d 368, at pages 370-371, as follows: "The slaughterer determined the total tonnage of beef carcasses, by grades, obtained from the cattle slaughtered during the monthly accounting period. The equivalent or `calculated' live weight of cattle in each grade slaughtered during the period was arrived at by working backward from the dressed carcass weights by the use of prescribed conversion factors or average dressing percentages, each dressing percentage being the assumed ratio of the weight of the dressed carcass of the particular grade to the live weight of the animal. The aggregate calculated live weight for cattle of each grade slaughtered during the accounting period was multiplied by the maximum price of the applicable range prices, and the amounts thus derived for each grade were added together. The resulting figure was the maximum permissible amount which the slaughterer could pay for the cattle slaughtered during the accounting period without loss of subsidy."
 
 
 5
 The aforesaid Directive of October 25, 1943, also ordered Defense Supplies Corporation to amend its subsidy regulation so as to provide for the payment of an additional subsidy of 80 cents per cwt. to a special segment of the industry known as non-processing slaughterers. See Earl C. Gibbs, Inc., v. Defense Supplies Corp., Em. App., 1946, 155 F.2d 525.
 
 
 6
 In conformity with the Directive, Defense Supplies Corporation issued Amendment 2 to its Regulation 3 to provide the extra compensation payments to non-processing slaughterers (9 F.R. 1820); and issued Amendment 3 to incorporate in Regulation 3 the so-called cattle stabilization plan. The subsidy regulation as it had been amended from time to time was reissued as Revised Regulation No. 3 effective January 19, 1945 (10 F.R. 4241). Departing briefly from chronological sequence, Defense Supplies Corporation was dissolved on July 1, 1945, and its functions transferred to its holding company, Reconstruction Finance Corporation, respondent herein, by the Act of June 30, 1945, 59 Stat. 310. Revised Regulation No. 3, as amended, was then taken over and administered directly by RFC (10 F.R. 11155).
 
 
 7
 Directive 28 of the Office of Economic Stabilization, effective January 29, 1945 (10 F.R. 522) went a step further, and directed the Price Administrator to incorporate the cattle stabilization plan into a price regulation, thereby adding the sanctions of the Emergency Price Control Act to the sanction of loss or diminution of subsidy, in order to induce slaughterers to keep their purchases of live cattle within the prescribed range prices in the over-all monthly average. Pursuant thereto the Price Administrator, on January 29, 1945, issued Maximum Price Regulation No. 574 — Live Bovine Animals (10 F.R. 1270), the validity of which we upheld in Federated Meat Corp. v. Fleming, Em.App., 1947, 159 F.2d 725.
 
 
 8
 MPR 574 established an overriding ceiling price, without regard to grade, for the sale or delivery of any live bovine animal or lot of live bovine animals. The buyer and seller were both bound by the overriding ceiling so imposed. Although it was technically applicable to the sale of any grade of cattle, its practical purpose was to put a price limit on sales and purchases of choice cattle while avoiding the difficulty of grading each animal on the hoof.
 
 
 9
 Section 2 of MPR 574 provided that no person in the course of trade or business "shall pay for live cattle bought or received during any accounting period an amount higher than the maximum amount fixed by this regulation for such live cattle during such accounting period". This prohibition was applicable to buyers only, not sellers. MPR 574 incorporated in detail the cattle stabilization plan as it already appeared in the subsidy regulation. In fact § 9(c) of MPR 574 specifically provided that the calculations for determining the maximum permissible cost of cattle during an accounting period "are the same as the calculations required in an application to Defense Supplies Corporation for subsidy payments on Form No. DS-T-55 Revised pursuant to Livestock Slaughter Payments Regulation No. 3, Revised, of Defense Supplies Corporation." As we have many times had occasion to point out, the livestock slaughter subsidy payments and the related price regulations were parts of an integrated program for the stabilization of meat prices. The cattle stabilization plan was at the heart of this stabilization program, for unless slaughterers on the whole confined their purchases of cattle within the applicable stabilization ranges, powerful inflationary pressures would jeopardize the maintenance of the maximum wholesale and retail prices for meat established by regulations of the Price Administrator.
 
 
 10
 The special profit subsidy to slaughterers, involved in the case at bar, has not previously received consideration by this court.
 
 
 11
 Directive 90 issued by the Stabilization Administrator on December 4, 1945 (10 F.R. 14743) directed RFC to amend the subsidy regulation so as to provide for two special subsidies in addition to the basic subsidy and the extra compensation to non-processing slaughterers above mentioned.
 
 
 12
 (1) The first of these additional subsidies provided in Directive 90 was contained in § 1 of the Directive by which RFC was ordered to amend the subsidy regulation so as to make "additional subsidy payments to slaughterers on account of livestock slaughtered from July 1, 1945 to October 31, 1945", in the sum of 8 cents per cwt. for cattle and calves and 20 cents per cwt. for sheep and lambs. In the preliminary recitals of Directive 90, the Stabilization Administrator stated that this special subsidy was intended to implement the so-called Barkley-Bates amendment to the Stabilization Act of 1942, 56 Stat. 765, 50 U.S.C.A. Appendix, § 961 et seq. This amendment added a proviso at the end of § 3 of the Stabilization Act of 1942 reading that "no maximum prices shall be established or maintained on products resulting from the processing of cattle and calves, lambs and sheep, and hogs, the processing of each species being separately considered, which, taken together, do not allow for a reasonable margin of profit to the processing industry as a group on each such species." 59 Stat. 309. The Barkley-Bates amendment has no bearing on the subsidy with which we are now concerned. It is to be noted also that this amendment was a limitation upon the power of the Price Administrator in prescribing maximum prices, but did not command the payment of any particular subsidies. If the yield from the subsidy prescribed in § 1 of Directive 90, plus the maximum prices permitted by the applicable price regulation, was insufficient to comply with the formula of the Barkley-Bates amendment, the only result would be to invalidate the established maximum prices, not to invalidate any provision of the subsidy regulation.
 
 
 13
 (2) The special profit subsidy with which the present case is concerned is found in § 2 of Directive 90 providing that, subject to the provisions of §§ 3 through 9 of the Directive, RFC is directed "to make additional subsidy payments to slaughterers on account of livestock slaughtered from April 1, 1945 to October 31, 1945" in the sum of 7 cents per cwt. for cattle and calves, 10 cents per cwt. for sheep and lambs, and 15 cents per cwt. for hogs. In the preliminary recitals to Directive 90, the Stabilization Administrator stated that the additional subsidy to be provided pursuant to § 2 was to honor an announcement on April 1, 1945, by the Price Administrator and the Economic Stabilization Director which was reasonably understood and relied on by the industry as an undertaking that, with respect to livestock slaughtered from April 1, 1945, to October 31, 1945, adjustments would be made in ceiling prices for meat and meat products, or in subsidy payments for livestock slaughter, so as to place "the industry as a whole, and any clearly defined segment thereof, in as favorable a position for the year as a whole as it was in during a representative prewar period both from the standpoint of average earnings and from the standpoint of the proportion of the output produced profitably". Section 4 of Directive 90, which is applicable to complainant because his other subsidy payments from RFC, exclusive of the extra compensation provided for non-processing slaughterers, amounted to more than $25,000 for the fiscal year, provided that the payments pursuant to § 2 of the Directive should be made "only if the slaughterer's profit for the fiscal year, before state and Federal income and excess profits taxes, amounts to less than one percent of his net sales of goods and services, and only to the extent necessary to return such profit to the slaughterer." Section 9 of Directive 90 contains a definition of "profit", to which we shall have to direct particular attention later in this opinion. The section reads (with italics added) as follows:
 
 
 14
 "`Profit', for the purposes of this directive, means the excess of net sales of goods and services, plus all subsidy payments (including payments to which the slaughterer would have been entitled but for violation of an Office of Price Administration regulation), over costs and expenses. In determining the relationship of profit to net sales for the purpose of this directive, the following items shall be excluded from costs and expenses:
 
 
 15
 * * * * * *
 
 
 16
 "(e) Any amount paid by the slaughterer for commodities or services in excess of the applicable maximum prices established by the Office of Price Administration; * * *".
 
 
 17
 By Amendment No. 13 to Revised Regulation No. 3, issued December 14, 1945, RFC amended the subsidy regulation so as to add a new § 7003.15 incorporating provisions for the two additional special subsidies pursuant to Directive 90. Section 7003.15(a) provided that all terms used and defined in Directive 90 "shall have the same meaning for purposes of this section, as they have in that Directive", thus incorporating by reference the definition of "profit" contained in § 9 of Directive 90, quoted above. Section 7003.15(b) (1) provided for the payment of the so-called Barkley-Bates subsidy at the rates prescribed in § 1 of Directive 90. With this we are not now concerned. Section 7003.15(b) (3) made provision for the payment of the special profit subsidy prescribed in § 2 of Directive 90, at the rates therein specified, to slaughterers who, like complainant, received livestock slaughter payments from RFC for the fiscal year in an amount in excess of $25,000. It was further provided, in conformity with § 4 of Directive 90, that the total payment of this special profit subsidy to slaughterers in complainant's category "shall not exceed the amount by which 1% of the slaughterer's net sales of goods and services for the fiscal year is greater than his profit for the fiscal year, before state and federal income and excess profits taxes."
 
 
 18
 As stated at the beginning of this opinion, complainant received from RFC in 1946 the sum of $4,587.85 on his claim for the special profit subsidy provided by § 7003.15(b) (3) of the subsidy regulation as revised. This payment was made subject to later audit and verification, under an agreement by complainant that he would repay upon demand any or all such subsidy to the extent that RFC determined that it had been improperly paid.
 
 
 19
 After audit of the claim, respondent made a number of adjustments the net effect of which was a determination by it on September 29, 1947, that there had been an overpayment on the claim to the extent of $2,827.33, which sum complainant refunded upon demand. It is conceded that, in his total purchases of cattle during the accounting periods in question, complainant exceeded his maximum permissible cost (under the cattle stabilization plan as incorporated in the subsidy regulation and in the corresponding provisions of MPR 574) by the sum of $14,948.95. In accordance with the then applicable requirements of the subsidy regulation, the amount of this excess had to be deducted from the payments which would otherwise have been due on complainant's claims for the basic livestock slaughter subsidy. The only items of adjustment which respondent made in the computation of complainant's special profit subsidy which complainant now seeks to challenge are two: (1) Respondent added to complainant's income figures the sum of $14,948.95 by which complainant's basic subsidy payments had been reduced because of his having exceeded his maximum permissible cost; and (2) at the same time respondent excluded from the computation of complainant's costs the identical sum of $14,948.95 as representing expenditures for the purchase of cattle in excess of the maximum permissible cost, an expenditure which complainant made in violation of § 2 of MPR 574.
 
 
 20
 On December 13, 1950, complainant filed a brief letter of protest against this determination or order making, as the protest alleged, an "illegal deduction of $2,827.33" from complainant's profit subsidy. The objections were couched in the most general terms, namely, that the order was "not in accordance with law" and was "arbitrary and capricious" in that (1) pursuant to the provisions of Revised Regulation No. 3 and related regulations, directives and orders, protestant was "clearly entitled" to receive the said special profit subsidy without deduction of the sum of $2,827.33, and (2) to the extent that such regulations and orders "are interpreted to require the denial of said subsidy claims, they are unreasonable and constitute a penalty unrelated to the object and purpose of the subsidy program."
 
 
 21
 Section 203(a) of the Emergency Price Control Act of 1942, as amended, 58 Stat. 638, provided: "At any time after the issuance of any regulation or order under section 2, * * * any person subject to any provision of such regulation, order, or price schedule may, in accordance with regulations to be prescribed by the Administrator, file a protest specifically setting forth objections to any such provision and affidavits or other written evidence in support of such objections. * * *"
 
 
 22
 As applied to protests against provisions of price regulations and orders entered thereunder, the Price Administrator from time to time issued detailed procedural regulations governing the form and content of protests, pursuant to the authority conferred in § 203(a) of the Act. Respondent RFC has never issued any such procedural regulations relating to protests against provisions of the subsidy regulation or orders issued thereunder, despite the fact that since the decision in Earl C. Gibbs, Inc., v. Defense Supplies Corp., Em.App., 1946, 155 F.2d 525, certiorari denied, 1946, 329 U.S. 737, 67 S.Ct. 51, 91 L.Ed. 637, it has been determined that the protest and judicial review procedures of §§ 203 and 204 of the Act are applicable to the subsidy regulation issued under § 2(e) of the Act, with the qualifications that in such cases the protest must be lodged with RFC (in succession to the dissolved Defense Supplies Corporation which first issued the subsidy regulation) and that a complaint filed in this court upon denial of such protest must be against RFC as respondent rather than against the Price Administrator. But notwithstanding the absence of any procedural regulation by RFC governing the form and content of protests, we think the protest must nevertheless be in substantial compliance with the minimum statutory requirement of § 203(a). That is, the protest must set forth the particular provision of the subsidy regulation, or of an order entered thereunder, against which the protest is directed, and further, the protest must "specifically" set forth objections to the protested provision. The salutary purposes of the statutory requirement of specificity in protests have been frequently referred to by this court. Bowman v. Bowles, Em.App., 1944, 140 F.2d 974, 977; Saunders Petroleum Co. v. Bowles, Em.App., 1945, 152 F.2d 112, 119-120. In fact this court's scope of review, upon denial of protests, is correspondingly limited by § 204(a) of the Act which provided, 56 Stat. 31: "No objection to such regulation, order, or price schedule, and no evidence in support of any objection thereto, shall be considered by the court, unless such objection shall have been set forth by the complainant in the protest or such evidence shall be contained in the transcript."
 
 
 23
 It seems to us obvious that the vague terms of the protest in this case did not "specifically" set forth the various objections to the subsidy regulation, and the protested order thereunder, which complainant in his brief and complaint asks this court to consider. While the protest proceeding was pending, complainant did write a letter to RFC on May 8, 1951, elaborating on the protest in reference to the two adjustments, above mentioned, made by respondent in the identical sums of $14,948.95, stating as follows: "I am sure that your close examination of Directive 90, Paragraph 9, will convince you that the duplication of the deduction from protestant's costs is completely unwarranted and not within the intent of the Directive."
 
 
 24
 In its denial of the protest on May 18, 1951, respondent did deal with this specific objection that the two adjustments in question constituted an unwarranted duplication, and incorporated by reference a letter from the auditor in charge to complainant, dated September 29, 1947, pointing out that both of these adjustments were required by the terms of § 9 of Directive 90. Therefore by a justified liberality we shall treat the protest as having been informally amended by the letter of May 8, 1951, adding this one specific objection. Under the strict limitation imposed by § 204(a) of the Act on the scope of our review, we have no jurisdiction to consider other objections now urged upon us which, so far as appears from the record, were never brought to the attention of respondent in the protest proceeding.
 
 
 25
 We agree with respondent that this specific objection to the alleged duplication of these two adjustments can only be reasonably understood as implying an acceptance of the validity of either the $14,948.95 deduction from costs or the $14,948.95 addition to subsidy income, taking exception merely to the asserted duplication in these adjustments. In his complaint and brief before this court, complainant has apparently abandoned the point of duplication, and urges other objections directed to challenging the validity of each of the adjustments, singly and collectively.
 
 
 26
 In answer to the charge of duplication, respondent relies upon the definition of "profit" in § 9 of Directive 90, incorporated by reference in the subsidy regulation. That definition specifically requires that in the computation of income there shall be included "all subsidy payments (including payments to which the slaughterer would have been entitled but for violation of an Office of Price Administration regulation)". [Italics added.] In addition, § 9(e) of Directive 90 requires the exclusion from costs and expenses of any amount paid by the slaughterer for commodities "in excess of the applicable maximum prices estab- lished by the Office of Price Administration". [Italics added.] It is a mere coincidence that the two adjustments made in pursuance of these separate provisions of the Directive were identical in amount.
 
 
 27
 Now complainant asserts that the special profit subsidy provided in § 2 of Directive 90 was intended to guarantee the profit position of slaughterers "regardless of live animal prices" which might have been paid by the slaughterers in the cattle market, and in particular regardless of whether the slaughterers observed or exceeded the maximum permissible cost under the cattle stabilization plan. Accordingly he urges that the provisions of § 9 of Directive 90 should be given what seems to us a strained interpretation in order to accomplish this supposed objective.
 
 
 28
 Thus, with respect to the adjustment of income by the addition of the amount by which complainant's basic subsidy payments were reduced because of his having exceeded the maximum permissible cost, complainant argues that this is not warranted by the language of § 9 of Directive 90, "including payments to which the slaughterer would have been entitled but for violation of an Office of Price Administration regulation". He says the diminution of the basic subsidy payments to complainant was not made because of violations of MPR 574, but for violation of the maximum permissible cost provisions of the revised subsidy regulation. But as we have pointed out above, the same cattle stabilization plan which had originally appeared in the subsidy regulation was, in January, 1945, incorporated into MPR 574, and purchases by a slaughterer during a given accounting period in excess of the maximum permissible cost of the cattle stabilization plan were made a violation of § 2 of MPR 574. The provisions of the subsidy regulation and of MPR 574 were interwoven as parts of a single stabilization program. If complainant had not been in violation of the maximum permissible cost provisions of MPR 574, he would necessarily not have been in violation of the corresponding maximum permissible cost provisions of the subsidy regulation; hence it is accurate to say that, had complainant not so violated MPR 574, he would not have had the sum of $14,948.95 deducted from his basic subsidy payments.
 
 
 29
 Likewise, with reference to the second adjustment, the exclusion of $14,948.95 from the computation of complainant's costs, complainant argues that this adjustment is not warranted by the language of § 9(e) of Directive 90 commanding the exclusion from costs and expenses of any amount paid by the slaughterer for commodities "in excess of the applicable maximum prices established by the Office of Price Administration". It is asserted that the only "maximum prices" established by MPR 574 are the so-called "overriding ceilings" applicable to sellers as well as buyers of cattle; that the maximum permissible cost provisions of MPR 574, obligatory only upon buyers of cattle, do not constitute "maximum prices" established by the OPA, within the meaning of § 9(e) of Directive 90. But upon a reasonable reading of the language of the definition, we think the maximum permissible cost provisions of MPR 574 may be said to be maximum permissible average prices which slaughterers were permitted to pay for cattle during a particular accounting period.
 
 
 30
 Complainant in effect urges us to accept an interpretation upon the language of Directive 90, establishing this special profit subsidy, which would have cut the heart out of the whole cattle stabilization plan. In the absence of clear language, such an administrative purpose could hardly be assumed. Respondent asserts, and it is not denied, that the interpretation of the Directive and of the subsidy regulation, under which the two adjustments were made, has been followed consistently by respondent in processing claims for the special profit subsidy here in question. If the language used were conceded to be susceptible of two interpretations, a court should give great weight to the consistent administrative interpretation. Bowles v. Seminole Rock & Sand Co., 1945, 325 U.S. 410, 413-414, 65 S.Ct. 1215, 89 L.Ed. 1700.
 
 
 31
 For the foregoing reasons, even if the objections now urged were properly before us, we would have to conclude that the complainant has failed to establish to our satisfaction that respondent's determination or order of September 29, 1947, applying the applicable language of the subsidy regulation in processing complainant's claim, was not in accordance with law or was arbitrary or capricious.
 
 
 32
 As above appears, complainant also sought in the protest, in very general language, to attack the validity of the provisions of the subsidy regulation itself, as interpreted by respondent. The protest asserts that the regulations, as so interpreted, "are unreasonable and constitute a penalty unrelated to the object and purpose of the subsidy program." So far as concerns the penalty objection, though this has been carried forward into the complaint, it seems to have been abandoned in complainant's brief. In any event, the objection is not well taken. Armour & Co. v. R. F. C., Em.App., 1947, 162 F.2d 918, 922; San Antonio Packing Co. v. R. F. C., Em.App., 1950, 182 F.2d 614, 618-619; Evergreen Meat Co. v. R. F. C., Em.App., 1951, 188 F.2d 368, 375-376.
 
 
 33
 As we have in previous cases pointed out, the administrative agencies charged with authority to promulgate a program of government subsidies were invested by law with very wide discretion in determining the extent to which subsidies would be granted. The mere fact that a subsidy granted on a particular commodity, under the limitations imposed in the applicable subsidy regulation, might have been insufficient, under the statutory standards binding upon the Price Administrator, to sustain the validity of maximum prices at levels established in a contemporaneous price regulation, would not warrant setting aside the subsidy regulation, or some provision thereof, as being "contrary to law" or "arbitrary or capricious". In general, if the administrative authorities chose to go no further in providing subsidies, the attack would have to be, not upon the subsidy regulation, but upon the provisions of the price regulation. The present case of course has nothing to do with the validity of price regulations. We have mentioned before that though this court has several times set aside an order or determination of RFC denying a subsidy claim, where we found that the order was "contrary to law" because not in accordance with the proper interpretation of the terms of the subsidy regulation, we have, on the other hand, never had occasion to set aside or declare invalid a provision of the underlying subsidy regulation itself. See the discussion in Evergreen Meat Co. v. R. F. C., supra, 188 F.2d 368, at pages 375-376.
 
 
 34
 A judgment will be entered dismissing the complaint.
 
 
 
 Notes:
 
 
 [1]
 The provision referred to was inserted in Revised Regulation No. 3 by Amendment 13 thereto issued December 14, 1945, to be effective December 25, 1945. Apparently this Amendment No. 13 was not published in the Federal Register