197 F.2d 866
 WEST COAST MEAT CO.
v.
RECONSTRUCTION FINANCE CORP.
 No. 588.
 United States Emergency Court of Appeals.
 Heard at Washington, D. C., May 23, 1952.
 Decided June 30, 1952.
 
 Alexander Boskoff, Washington, D. C., for the complainant.
 Maurice S. Meyer, Atty., Department of Justice, Washington, D. C. (J. Gregory Bruce, Atty., Department of Justice, Washington, D. C., on the brief), for the respondent.
 Before MAGRUDER, McALLISTER and LINDLEY, Judges.
 MAGRUDER, Judge.
 
 
 1
 This is another meat subsidy case, involving the extra compensation payable to that segment of the industry known as non-processing slaughterers. For an explanation of the cattle slaughter payments provided as a complement to the price regulations issued under the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 et seq., see Earl C. Gibbs, Inc., v. Defense Supplies Corp., Em.App. 1946, 155 F.2d 525.
 
 
 2
 The basic cattle slaughter subsidy payments were originally established, effective June 7, 1943, by Regulation No. 3 issued by Defense Supplies Corporation (8 F.R. 10826). Subsequently, on July 30, 1943, complainant West Coast Meat Company was incorporated in the State of California for the purpose of engaging in business as a slaughterer of cattle. On August 9, 1943, complainant purchased for $6,000 in Hayward, California, an abattoir which had been standing idle for several years. In the ensuing weeks complainant expended approximately $8,000 for repairs and improvements. On October 7, 1943, complainant applied to the United States Department of Agriculture for a license to operate as a federally inspected plant. The Department of Agriculture on November 5, 1943, issued to complainant a license as a Class I slaughterer, on condition that complainant deliver to the armed services the greater part of its beef. On November 8, 1943, complainant began its slaughtering operations as a federally licensed non-processing slaughterer. Its plant was not equipped for any processing operations, and during the succeeding years it did not engage in processing or fabricating meat by-products of any kind.
 
 
 3
 We note at this point that when complainant was incorporated, bought and repaired the idle slaughtering plant, and applied to the Department of Agriculture for its license, it could not have done so in reliance upon receiving any slaughter subsidy other than the basic subsidy then provided, payable to all slaughterers. There was not at this time any provision for additional compensation to that segment of the industry known as non-processing slaughterers.
 
 
 4
 A directive of the Office of Economic Stabilization, issued October 25, 1943 (8 F.R. 14641) ordered Defense Supplies Corporation to amend the subsidy regulation so as to provide an additional subsidy of $.80 per cwt. for cattle slaughtered by non-processing slaughterers. Pursuant thereto DSC issued Amendment 2 to its Regulation No. 3, effective November 1, 1943 (9 F.R. 1820) making provision for such extra compensation payments. Section 7003.14, added by Amendment 2 to Regulation No. 3, contained this definition:
 
 
 5
 "`Non-processing slaughterer of beef' means an unaffiliated slaughterer as hereinafter defined who during six consecutive months of 1942, sold, and who currently sells, 98% or more, measured in dressed carcass weight, of the total beef produced from cattle slaughtered by him in all his establishments, in the form of carcasses, wholesale cuts, boneless beef or ground beef."
 
 
 6
 The clear and unambiguous meaning of this provision of the subsidy regulation, as it seems to us, and as it has been consistently interpreted by the administrative authorities, is that a slaughterer, in order to qualify for the extra compensation, must have not only been a non-processing slaughterer in his current operations, but also must have been engaged in business as a non-processing slaughterer during the base period.
 
 
 7
 The foregoing definition was carried forward into Revised Regulation No. 3 issued by Defense Supplies Corporation effective January 19, 1945 (10 F.R. 4241). Upon the dissolution of DSC on July 1, 1945, and the transfer of its functions to the Reconstruction Finance Corporation, Revised Regulation No. 3, as amended, was taken over and administered directly by RFC (10 F.R. 11155).
 
 
 8
 Amendment 5 to Revised Regulation No. 3, effective July 1, 1945 (10 F.R. 8074, 11155), made a change in the base period requirement of the definition, as follows:
 
 
 9
 "`Non-processing slaughterers of beef' means an unaffiliated slaughterer as hereinafter defined who, during six consecutive months between January 1, 1941, and October 1, 1943, sold, and who currently sells, 98% or more, measured in dressed carcass weight, of the total beef produced from cattle slaughtered by him in all his establishments in the form of carcasses, wholesale cuts, boneless beef, or ground beef."
 
 
 10
 This change was made in compliance with Directive 56 of the Office of Economic Stabilization (10 F.R. 7117).
 
 
 11
 By Amendment 7 to Revised Regulation No. 3 (10 F.R. 11155), a further change was made in the base period requirement, as follows:
 
 
 12
 "`Non-processing slaughterers of beef' means an unaffiliated slaughterer as hereinafter defined who during six consecutive months, or during such other representative period as may be determined by the Director of Economic Stabilization, within the period between January 1, 1941, and October 1, 1943, sold, and who currently sells, 98% or more, measured in dressed carcass weight, of the total beef produced from cattle slaughtered by him in all his establishments in the form of carcasses, wholesale cuts, boneless beef, or ground beef."
 
 
 13
 This change was made in compliance with Amendment 1 to Directive 56 of the Office of Economic Stabilization (10 F.R. 8476).
 
 
 14
 It appears from the foregoing that, though changes were made in the original base period requirement, the administrative authorities having control over the subsidy program adhered to their policy of limiting the payment of the extra compensation to those applicants who historically had belonged to that segment of the industry known as non-processing slaughterers, thus excluding from eligibility such persons as this complainant, who was a newcomer in the field, and who did not commence business as a non-processing slaughterer until after November 1, 1943, the effective date of Amendment 2 to Regulation No. 3.
 
 
 15
 Complainant filed its formal protest on December 13, 1950, against letter orders of Defense Supplies Corporation, and of respondent Reconstruction Finance Corporation as its successor, determining that under Amendment 2 to Regulation No. 3, and under the successive amendments to the base period requirement, the claims of West Coast Meat Company to extra compensation as a non-processing slaughterer must be denied. The protest was based upon two grounds: (1) That DSC and respondent, in denying complainant's claims for extra compensation, had misinterpreted the provisions of the regulation above set forth, and (2) that if the subsidy regulation, properly interpreted, excludes complainant from eligibility for the special subsidy, the provisions of the subsidy regulation requiring such result are "illegally discriminatory against Protestant and others similarly situated."
 
 
 16
 Respondent denied the protest on November 5, 1951, on the ground that West Coast Meat Company did not have a qualifying base period history of operation as a non-processing slaughterer.
 
 
 17
 Claiming to be aggrieved by this denial, West Coast Meat Company filed its complaint in this court on December 4, 1951. The complaint adheres to the alternative contentions stated in the protest: (1) That respondent's disallowance of the extra subsidy claims was as a matter of law based upon an erroneous interpretation of the regulation, which should be read as "intended to identify non-processing slaughterers in the light of operations during the selected base period only where the slaughterer had been in business during that period" and as "not intended to be applied so as to foreclose without further consideration new businesses which had not been operating during the selected base period", and (2) that if respondent's interpretation of the regulation must be accepted, then the regulation itself is invalid in so far as it discriminates "without rational basis against those non-processing slaughterers who were not in operation during the selected base period."
 
 
 18
 As already indicated, we think the base period requirement of the subsidy regulation is clear and unambiguous, and that it is not susceptible of the interpretation which complainant urges. What complainant is asking us to do is not to interpret the language of the regulation, but to insert a qualification therein that the base period requirement shall be applicable only if an applicant was in the slaughtering business during the base period.
 
 
 19
 We are equally convinced that this court would not be warranted in declaring the subsidy regulation itself to be invalid to the extent that it excluded from eligibility for the extra compensation those non-processing slaughterers who, like complainant, did not enter the slaughtering business until after October 1, 1943. The base period requirement, in its successive forms, was inserted in the subsidy regulation in compliance with directives of the Office of Economic Stabilization, which had been given overriding authority over the entire subsidy and stabilization program by Executive Order 9250, 50 U.S.C.A.Appendix, § 901 note (7 F.R. 7871). If we should enter a judgment declaring that complainant, and other slaughterers similarly situated, are entitled to receive the extra compensation payable to non-processing slaughterers, as defined, we should in effect be telling the administrative authorities, whose business it was to formulate and administer a subsidy program, that they must enlarge the class of persons whom they had previously determined to be eligible for the special subsidy. No such function has been confided to this court.
 
 
 20
 It is true we said by way of dictum in Earl C. Gibbs, Inc., v. Defense Supplies Corp., Em.App.1946, 155 F.2d 525, 531 that if in lieu of a higher level of maximum prices a subsidy were provided for a particular class of sellers, but a provision of the subsidy regulation arbitrarily excluded a member of the class from participation in the subsidy, this court would have jurisdiction to set aside the discriminatory provision as being arbitrary or capricious. Thus if the subsidy regulation, after providing for the payment of extra compensation to non-processing slaughterers, as defined, had contained a proviso excluding from participation non-processing slaughterers who were Democrats, or Republicans, or red-headed, this court might well have power to set aside such a proviso containing criteria of exclusion so arbitrary, and so irrelevant to the purposes of the Act. But as we pointed out in Flour Mills of America, Inc., v. R. F. C., Em.App.1950, 179 F.2d 965, 969, "in view of the very wide discretion conferred upon the administrative agencies charged with authority to promulgate a program of government subsidies, the case would necessarily be a rare one in which we would be warranted in setting aside a term of such a regulation as being `arbitrary or capricious'." The present is far from being such an extreme and exceptional case. It was within the competence of the administrative authorities so to define the class of eligible applicants as to require that they must not only be engaged in no substantial processing in their current operations but also, by reason of the base period requirement, must have historically belonged to that segment of the industry described as non-processing slaughterers, who because of special economic factors applicable to them as a group needed the extra subsidy in order to remain in business under the applicable maximum prices. Complainant did not fall within the eligible class, as defined in the regulation.
 
 
 21
 What we recently had occasion to say in Danz v. R. F. C., Em.App.1952, 193 F.2d 1010, 1017, is applicable here:
 
 
 22
 "As we have in previous cases pointed out, the administrative agencies charged with authority to promulgate a program of government subsidies were invested by law with very wide discretion in determining the extent to which subsidies would be granted. The mere fact that a subsidy granted on a particular commodity, under the limitations imposed in the applicable subsidy regulation, might have been insufficient, under the statutory standards binding upon the Price Administrator, to sustain the validity of maximum prices at levels established in a contemporaneous price regulation, would not warrant setting aside the subsidy regulation, or some provision thereof, as being `contrary to law' or `arbitrary or capricious'. In general, if the administrative authorities chose to go no further in providing subsidies, the attack would have to be, not upon the subsidy regulation, but upon the provisions of the price regulation. The present case of course has nothing to do with the validity of price regulations. We have mentioned before that though this court has several times set aside an order or determination of RFC denying a subsidy claim, where we found that the order was `contrary to law' because not in accordance with the proper interpretation of the terms of the subsidy regulation, we have, on the other hand, never had occasion to set aside or declare invalid a provision of the underlying subsidy regulation itself. See the discussion in Evergreen Meat Co. v. R. F. C., [Em.App.] supra, 188 F.2d 368, at pages 375-376."
 
 
 23
 In Ben H. Rosenthal & Co., Inc., v. Porter, Em.App.1946, 158 F.2d 171, we recognized the reasonableness of the base period requirement in the subsidy regulation. That case involved the validity of the maximum prices established in RMPR 169, as applied to non-processing slaughterers who, because of their failure to meet the base period requirement, were ineligible for the extra subsidy paid to non-processing slaughterers as defined. We said, 158 F.2d at pages 175-176:
 
 
 24
 "The Administrator has offered what seems to us to be a rational exposition of the need for the base period requirement. He says: `The base period limitation for eligibility was deemed essential to proper administration of the subsidy program for two reasons. (1) The extra compensation was necessary to enable slaughterers not engaged in processing to continue in business under price control. It was designed to protect those firms which historically had engaged in this particular type of operation, but not to induce slaughterers heretofore engaged in processing to change their practices for the purpose of obtaining the extra subsidy. Nor was there any intention to encourage new slaughterers by the promise of a special subsidy. The difficulty of determining precisely the amount of differential subsidy needed for the group as a whole, and the probability that in certain areas it would be overgenerous, made it likely that any special subsidy fixed would, at least at some time and in some places, provide such encouragement to enter the slaughtering business or to abandon processing operations. In a market characterized by scarcity of supplies such encouragement would have been utterly unjustifiable. Since the non-processing group constituted a well defined segment of the industry representing about 15% of the total production, it was believed that the Administrator's legal duty to provide relief was limited to those who historically belonged to that segment. (2) Administration of the subsidy program clearly required establishment of a base period as a condition of eligibility. Without a showing of continuity of the same type of operation over a substantial period, the task of determining eligibility would become a practical impossibility as each slaughterer would be able to claim the extra compensation for brief periods during which he did no processing.'
 
 
 25
 "Thus, RMPR 169 was `generally fair and equitable' in its application to the industry as a whole, and in view of the provision of the special subsidy it could not be deemed to have been arbitrary or capricious in its general application to that segment of the industry described as non-processing slaughterers. The class of slaughterers eligible for the special subsidy had to be defined, and definition inevitably gave rise to borderline cases where some individuals excluded from the special subsidy might have been subjected to hardship. Here the classification adopted has not been shown to have been unreasonable. The Act does not guarantee a profit to each individual subject to the regulation."[1]
 
 
 26
 It may be granted that it might have been not unreasonable to enlarge the class of persons eligible for the special subsidy so as to include non-processing slaughterers, like complainant, who opened a new slaughtering business subsequent to the selected base period. But it was the function of the administrative agencies concerned, not of this court, to define the class eligible to receive this subsidy out of the public treasury.
 
 
 27
 A judgment will be entered dismissing the complaint.
 
 
 
 Notes:
 
 
 [1]
 In fact, this complainant did not actually operate at a loss, despite the fact that it did not receive the extra compensation payable to non-processing slaughterers, as defined. From the beginning of its operations in November, 1943, through October 31, 1946, when the subsidy program was discontinued, complainant had gross sales of $1,225,839.78 and reported a profit before income taxes of $5,371.31 for the same period